**VELERON HOLDING, B.V., Plaintiff,**

v.

**Morgan STANLEY; Morgan Stanley Capital Services, Inc.; Morgan Stanley & Co., Inc.; and Morgan Stanley & Co., Defendants.**

**No. 12 Civ. 5966(CM).**

United States District Court, S.D. New York.

Signed July 22, 2015.

Filed July 23, 2015.

---

**63.** *See* Opp. Mem. at 20.

**66.** *See* Opp. Mem. at 20–21.

Aaron Harvey Marks, Marc E. Kasowitz, Ronald Robert Rossi, Emilie Beth Cooper, Kasowitz, Benson, Torres & Friedman, LLP, New York, NY, Andrew R. Mac, Epam USA PLLC, Washington, DC, Ely Goldin, Fox Rothschild LLP, Blue Bell, PA, Ernest Edward Badway, William Christian Moffitt, Fox Rothschild, Attorneys at Law, New York, NY, for Plaintiff.

Christopher Louis Garcia, Jonathan D. Polkes, Paul Ivor Dutka, Amanda Lynn Burns, Weil, Gotshal & Manges LLP, New York, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY WITHOUT PREJUDICE TO APPROPRIATELY TIMED IN LIMINE APPLICATIONS

McMAHON, District Judge.

Plaintiff Veleron Holding, B.V. ("Veleron") brings this lawsuit against Morgan

Stanley, Morgan Stanley Capital Services, Inc., Morgan Stanley & Co., and Morgan Stanley & Co., Inc. (collectively "Morgan Stanley" or "Defendants") alleging that Morgan Stanley violated § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b5. Presently before the Court are Docket # 249, Morgan Stanley's motion for summary judgment and Docket ## 241 and 245, Morgan Stanley's motions to exclude the opinions of two of Veleron's expert witnesses.

A little over a year ago, when deciding Morgan Stanley's last motion for summary judgment, I wrote the following words:

> Discovery has been taking place in this Court since I decided the motions to dismiss last May. Without going into detail here, suffice it to say that enough has been disclosed to this Court to convince me that Morgan Stanley is unlikely to prevail should it ever make a motion for summary judgment dismissing Veleron's securities fraud claim on the merits. Evidence has turned up during discovery that, if credited by a trier of fact, would tend to support a claim that traders at Morgan Stanley shorted Magna stock while in possession of material, non-public information. There is also evidence (consisting of both party admissions and expert testimony) that this trading depressed the price of Magna's stock just prior to the ABB.

After a full review of the record submitted by the parties and the arguments they have briefed, my instincts are for the most part confirmed; while Veleron's market manipulation claim must be dismissed, its insider trading claim is very much alive. Morgan Stanley's motion for summary judgment is therefore GRANTED in part

and DENIED in part. Its companion motions to exclude the opinion testimony of Sanjay Unni and Robert M. MacLaverty are DENIED.

## BACKGROUND

### Basic Element and Russian Machines Invest in Magna.

Plaintiff Veleron is a "B.V.," or Dutch limited liability company. (Def. 56.1 ¶ 7.) Veleron was formed as a special purpose vehicle ("SPV") to facilitate an investment by Russian Machines ("RM")—an entity organized under the laws of Russia (Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.)—in non-party Magna International, Inc. ("Magna"), a Canadian auto parts manufacturer with a global footprint. (Def. 56.1 ¶ 5.) RM is the sole shareholder of Veleron. (Def. 56.1 ¶ 8; Compl. ¶ 16.) RM is ultimately controlled by Basic Element, another company organized under the laws of Russia. (Def. 56.1 ¶ 2; Pl. Resp. to Def. 56.1 ¶ 2.) Basic Element, in turn, is owned entirely by an individual, Oleg Deripaska. (Compl. ¶ 32.)

In May 2007, it was announced that RM would make a strategic investment in Magna, whose shares are traded on the New York Stock Exchange ("NYSE") and the Toronto Stock Exchange. (Pl. Counter 56.1 ¶¶ 3–4; Def. 56.1 ¶ 5; Pl. 56.1 ¶ 1.) RM intended to finance the acquisition primarily through a loan of approximately $1.2 billion, to be obtained by Veleron from BNP Paribas, which formerly was a defendant in this action. (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 8.) [1] RM provided additional equity, so that the total value of the investment was approximately $1.54 billion. (Pl. 56.1 ¶¶ 1, 9.) With these funds, Veleron purchased 20 million shares of Magna, or approximately one fifth of the company's out-

---

1. BNP was dismissed as a defendant in this action. (Docket # 117 "Decision and Order" at 17.)

standing stock. Veleron's Magna shares were pledged as security for the loan. (Def. 56.1 ¶¶ 11–12; Pl. 56.1 ¶ 9–10.) [2]

The loan from BNP to Veleron was memorialized in two agreements.

The first, a "Credit Agreement" between Veleron (as "Borrower") and BNP (as "Agent"), was ratified on September 20, 2007. (Polkes Decl. Ex. 8; Cooper Decl. Ex. 7.) Pursuant to the Credit Agreement, Veleron was obligated to pay, "All Advances and other amounts outstanding under the Credit Facility including unpaid principal, interest and fees ... on the Maturity Date." (Credit Agreement § 5.2.) Further, the Credit Agreement required Veleron to maintain an adequate "coverage ratio"—the ratio of the value of the Magna shares serving as collateral to the outstanding loan balance. (Credit Agreement §§ 1.1(32), 7.5(1).) If the coverage ratio fell below a certain minimum value, Veleron was required to post cash collateral sufficient to restore the coverage ratio no later than two days after BNP presented it with a written demand. (Credit Agreement § 7.5(1).) If the coverage ratio fell further, BNP had the right to make an accelerated margin call, thereby requiring Veleron to post sufficient cash collateral to restore the coverage ratio within one day. (Credit Agreement § 7.6.)

The Credit Agreement specified certain events of default, including: if "The Borrower fails to make when due ... any payment of principal or margin required to be made by the Borrower ..." (Credit Agreement § 10.1(1).) Upon an event of default, the Credit Agreement allowed BNP to deliver to Veleron a written notice stating BNP's intentions to exercise its rights under the agreement. (Credit

Agreement § 10.2(1).) Those rights included the rights to "declare that the Credit facility has expired," and to "declare the entire principal amount of all Advances outstanding, all unpaid accrued interest and all fees and other amounts ... immediately due and payable ...." i.e., to accelerate the loan. (Credit Agreement § 10.2(1)(a)-(b).)

BNP and Veleron executed the Credit Agreement on September 20, 2007. The Credit Agreement provided that it was made "Between VELERON ... as Borrower and EACH OF THE FINANCIAL INSTITUTIONS AND OTHER ENTITIES FROM TIME TO TIME PARTIES HERETO as Lenders and BNP Paribas SA as Agent." (Def. 56.1 ¶ 14; Cooper Dec. Ex. 7 at 1.) No other Lenders were ever added to the Credit Agreement, so the only Lender was BNP.

The second agreement was a "Pledge and Security Agreement" between Veleron (as "Pledgor") and BNP Paribas (as "Agent"), also executed on September 20, 2007. (Cooper Decl. Ex. 8.), by which Veleron granted BNP a security interest in the 20 million Magna shares to collateralize the $1.2 billion loan. (Pledge Agreement § 2.)

Under both the Credit Agreement and the Pledge Agreement, BNP was required to declare an event of default before any liquidation of the pledged collateral. (Cooper Dec. Ex. 7 §§ 1.1(99), 10.2(1)(b); Cooper Dec. Ex. 8 §§ 2.2, 4.4.)

Both agreements preserved BNP's rights and remedies against Veleron to the fullest extent of the law. Thus, the Credit Agreement provided that BNP's remedies upon an event of default were "cumulative

---

**2.** The details of the investment are rather complex, as the loan and stock purchase were structured through a maze of shell companies to minimize tax costs. That structure is detailed in the Investor Pack, which is discussed below; however, those details are irrelevant to the resolution of this case.

and ... in addition to and not in substitution for any rights or remedies provided by law or equity." (Cooper Dec. Ex. 7 §§ 11.1, 11.3.) So too, BNP's "rights, remedies and powers under th[e] Pledge and Security Agreement or hereafter existing at law or in equity or by statute shall be cumulative and nonexclusive of any other rights, remedies and powers which [BNP] may have under any other agreement, including the other Loan Documents ..." (Cooper Dec. Ex. 8 § 4.5.)

The Credit Agreement also contained a confidentiality provision, binding BNP "to keep confidential *any information obtained in relation to the [Credit] Agreement* .." (Cooper Dec. Ex. 7 § 14.12.) (Emphasis added). That "confidentiality obligation ... d[id] not extend to," inter alia, "disclosure by the Agent [ (BNP) ] necessary for discharging its responsibilities under the Agreement, *subject to recipients of such information signing a confidentiality and non-disclosure agreement for the benefit of [Veleron] and in form and substance reasonably satisfactory to [Veleron] in advance of receiving such information.*" (*Id.* § 14.12(a), (c) (emphasis added).)

Magna publicly disclosed the fact of the Credit Agreement and its terms in a Schedule 13D filing on October 1, 2007. (Def. 56.1 ¶ 13.) The confidentiality provision was not among the key terms discussed in the text of the 13D; but the Credit Agreement was attached in its entirety as Exhibit B to the filing, so the provision was a matter of public record from and after October 1, 2007. (*See* http://www.sec.gov/Archives/edgar/data/749098/000119312507210928/dsc13d.htm).

### Morgan Stanley Enters into an Agency Disposal Agreement

On January 31, 2008, Morgan Stanley entered into an "Agency Disposal Agreement" ("ADA") with BNP. Pursuant to the ADA, Morgan Stanley agreed "to act as [BNP's] agent in respect of the disposal of part or all of the [Pledged Collateral of the Loan] ..." if Veleron defaulted and BNP decided to sell the Magna stock it was holding as collateral. (Cooper Dec. Ex. 10 § 1, Whereas clause (D).) The proceeds of any disposal conducted under the agreement were to be applied to discharge Veleron's obligations to BNP pursuant to the Credit Agreement. (Cooper Dec. Ex. 10 § 2, Whereas clause (C).)

The ADA stated that Morgan Stanley, "in providing investment banking services to the Client in connection with any Disposal or the Disposal Programme (including and pursuant to the terms of this Agreement) ... is acting as an independent contractor and not as a fiduciary and [BNP] does not intend Morgan Stanley to act in any capacity other than independent contractor including as a fiduciary or in any other position of higher trust." (ADA, Polkes Dec. Ex. 14 § 2.) Further, the ADA gave Morgan Stanley the right to determine both the method by which the collateral would be sold and the price to be obtained therefor. However, its discretion was not unlimited: Morgan Stanley "acknowledge[d] that [BNP], in enforcing its security under the Pledge Agreement [with Veleron], is obligated to seek the best price available in the market for transactions of a similar size and nature at the time of sale, and Morgan Stanley agrees to use all reasonable [sic] to comply with such terms." (*Id.* § 2.)

### Morgan Stanley Receives an "Investor Pack" Regarding the BNP–Veleron Transaction.

With Veleron's knowledge, BNP syndicated participation in the risk of the loan. (Pl. Counter 56.1 ¶ 22.) Morgan Stanley ultimately became a member of that syndicate.

In connection with its consideration of a possible participation in the Veleron loan, Morgan Stanley received a Veleron-approved "Investor Pack" from BNP. (Pl. Counter 56.1 ¶ 33.)

The Investor Pack contained a confidentiality provision regarding "Evaluation Material":

Veleron considers the Evaluation Material to include confidential, sensitive and proprietary information and [the recipient] agrees that it shall keep such Evaluation Material confidential in accordance with its established procedures for keeping information confidential and with safe and sound banking practices.

(*Id.*) The confidentiality "terms and conditions ... shall apply until such time, if any, that the Recipient becomes a party to the definitive agreements regarding the Financing, and thereafter the provisions of such definitive agreements relating to confidentiality shall govern." (Cooper Dec. Ex. 12 at 4.)

The Investor Pack defined "Evaluation Material" as:

the Investor Pack, any other information regarding Veleron, Basic Element Ltd., Magna International Incorporated ('Magna'), their affiliates or the Financing (as defined herein) *furnished or communicated to the Recipient by or on behalf of Veleron, in connection with the Transaction* (whether prepared or communicated by [BNP] or Veleron, their respective advisors or otherwise ...

(Cooper Dec. Ex. 12 at 2.) (Emphasis added). The "Transaction" was described as a complex mechanism by which Veleron would acquire 20 million shares of Magna stock, which included lending BNP's borrowed money to a newly formed Canadian holding company called "Newco II," which would purchase the 20 million shares using that money and put up the shares as collateral. (Polkes Ex. 11 § II(1)(a).) The

Pack contains no pithy definition of the Transaction, but its Executive Summary explains that:

The Transaction involves the creation of a joint venture holding company "Newco" (the parent of Newco II) capitalized by Frank Stronach and other existing senior executives of Magna with Class B senior voting shares of Magna, and take a number of Class A subordinated voting shares in return for Newco shares. The end effect, taking into account the above mentioned capitalization and the subscription by Newco II of the 20 million Shares, is that Newco will hold approximately 16.5% of the economic value of Magna, and 68.8% of the voting rights. Veleron will also be issued shares in Newco in return for i) the provision of the USD1.54 billion financing to Newco II mentioned above and ii) a cash payment of USD75 million. Such shareholding in Newco will give Oleg Deripaska indirectly 25.5% of the voting interest and 6.9% of the economic interest in Magna, but more importantly, following various contractual arrangements between the shareholders of Newco, an effective joint control of Magna with the Stronach family.

(*Id.* § I.) In short, the "Transaction" was the acquisition by Veleron (and indirectly by Deripaska) of a significant interest in Magna.

The Investor Pack bore the following legend:

ACCEPTANCE OF THIS INVESTOR PACK CONSTITUTES AN AGREEMEMNT TO BE BOUND BY THE TERMS OF THIS NOTICE AND UNDERTAKING. IF THE RECIPIENT IS NOT WILLING TO ACCEPT THE INVESTOR PACK AND OTHER EVALUATION MATERIAL AS DEFINED HEREIN ON THE TERMS

SET FORTH IN THIS NOTICE AND UNDERTAKING, IT MUST RETURN THE INVESTOR PACK AND ANY OTHER EVALUATION MATERIAL TO [BNP] IMMEDIATELY WITHOUT MAKING ANY COPIES THEREOF, EXTRACTS THEREFORM OR USE THEREOF.

(Cooper Dec. Ex. 12 at 2.)

Morgan Stanley received an Investor Pack sometime in 2007, and was still in possession of it as of September 30, 2008. (Pl. Counter 56.1 ¶ 34.)

Morgan Stanley took a participation in the Loan by entering into a credit default swap agreement (the "Swap") with BNP on or about March 28, 2008–shortly after it signed on as Disposal Agent. Pursuant to that Agreement, Morgan Stanley assumed 8.1% of BNP's credit risk associated with the Loan. It received a fixed payment from BNP in exchange. (Polkes Decl. Ex. 12 and Ex. 14 § 2.) [3]

Morgan Stanley was one of four institutions that hedged BNP's risk on the loan; the other hedging institutions included Credit Suisse, Natixis, and the Royal Bank of Scotland. (Pl. 56.1 ¶ 22.)

Veleron asserts that Morgan Stanley never entered into a "definitive agreement" in connection with the financing. (Cooper Dec. Ex. 47.) That is not correct. Morgan Stanley certainly never signed any agreement to become a Lender-indeed, as far as I know, there is no evidence that Morgan Stanley was ever asked to become a Lender, because it was not eligible to become a Lender. As I observed in the decision on the motion to dismiss, no U.S. institution was eligible to become a Lender under the Loan Agreement. (Decision and Order of May 16, 2013, Docket # 217 at 44.)

Morgan Stanley was also not eligible to become a "Participant" in the loan, for the same reasons (i.e., it was subject to United States securities laws). *Id.* at 44 n. 10. However, it nonetheless took on a share of the risk of the loan. It did so by signing a "definitive agreement. . . . regarding the Financing"—namely, the Credit Default Swap Agreement. As a matter of plain language, the Credit Default Swap Agreement, which hedged the loan (the Financing) contemplated by the Investor Pack, qualifies as a "definitive agreement . . . .regarding the Financing." As a result, the terms of the Credit. Default Swap Agreement governing confidentiality (if any) in the Evaluation Material replaced the confidentiality provision of the Investor Pack.

No provision in the Credit Default Swap Agreement explicitly binds Morgan Stanley to keep confidential information that it received from BNP relating to the Evaluation Material (which is the only "confidential information" in the Investor Pack). To the contrary: the Swap Agreement incorporates by reference a provision that specifically disclaims any confidentiality obligation. A confirmation entitled "Confirmation for Credit Derivative Transaction," issued in connection with the settlement of the Swap, which was sent from BNP to Morgan Stanley on March 28,

---

**3.** A CDS functions like a credit insurance agreement covering a referenced asset: one party, the "credit protection buyer," pays periodic premiums in exchange for a promise that the other party, the "credit protection seller," will make an insurance payout should the asset experience a "negative credit event," such as a payment default or credit rating downgrade. Synthetic CDOs allow investors to assume the position of the credit protection seller, betting that the referenced assets will not experience a negative credit event.

*Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F.Supp.2d 624, 631 (S.D.N.Y.2012) (citation omitted).

2008, provides that "The definitions and provisions contained in the 2003 ISDA[4] Credit Derivatives Definitions ... as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation." (Polkes Dec. Ex. 12.) Section 9.1(b)(v) of the 2003 ISDA Definitions provides as follows: "a party receiving information from the other party *with respect to such Credit Derivative Transaction* shall not become subject to any obligation of confidentiality in respect of that information." (Polkes Decl. Ex. 13 (emphasis added).)[5]

The Swap Agreement required BNP to notify Morgan Stanley of margin calls made under sections 7.5(1) or 7.6 of the Credit Agreement, within one business day of such margin calls. (Swap Agreement § 7(g).) BNP also promised to notify Morgan Stanley of any pre-payments by Veleron, within one business day of the reduction in the loan amount. (*Id.*) If BNP decided not to exercise certain rights under the Credit Agreement—such as waiving the right to declare a default or accelerate the loan—then the Swap Agreement required BNP to inform Morgan Stanley of its decision to forgo those rights. (Swap Agreement § 7(d).) Proceeds from any sale of the pledged collateral would be applied to "the payment of the principal amount of any Obligations outstanding under [the Credit Agreement] and then to the payment of accrued and unpaid interest thereunder ... Z" (Cooper Dec. Ex. 7 § 6.4.)

Morgan Stanley's agreement to hedge the margin loan placed it in the position of having two different and potentially competing interests in Veleron's ownership of Magna stock: it bore a significant portion of the risk of Veleron's default under the loan, but it stood to gain a sizable fee were it called upon to dispose of the Magna stock that collateralized the loan.

## Morgan Stanley Receives Word that BNP is Likely to Issue a Margin Call that Veleron is Unlikely to Meet.

This lawsuit concerns events that occurred between September 29, 2008 and October 3, 2008. They very mention of those dates conjures the horror of the crisis that gripped the Western world's financial markets and institutions that fall. Morgan Stanley was devastated by that crisis. Its liquid assets fell by approximately $75 billion between August 28, 2008 and October 3, 2008; the *Washington Post* reported that, between late September and October 11, 2008, Morgan Stanley took a

---

**4.** ISDA is the International Swaps and Derivatives Association. Its master agreement governs many thousands of interest swap transactions between counterparties and includes provisions applicable to all swap transactions. *Thrifty Oil Co. v. Bank of America Nat. Trust & Sav. Ass'n*, 322 F.3d 1039, 1042–1043 (9th Cir.2003); *see also Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 103–04, 951 N.Y.S.2d 19 (N.Y.App.Div. 1st Dep't 2012) ("ISDA Master Agreements ... are used in many thousands of interest rate swap transactions each year. Each ISDA Master Agreement is executed together with a schedule (ISDA Schedule,) which serves the purpose of customizing the parties' contractual arrangement by reflecting any deviations from the standard language of the Master Agreement, as well as any specific

terms that have been negotiated by the parties ...").

**5.** The Swap Agreement "supplements, forms a part of, and is subject to, the ISDA Master Agreement, dated as of June 26, 1996, as amended and supplemented from time to time." (Cooper Dec. Ex. 9 at 1.). Veleron argues that Morgan Stanley failed to produce a copy of this Master Agreement (Pl. 56.1 ¶ 21), and so cannot now rely on any confidentiality provision it might contain. As Morgan Stanley indubitably produced the 2003 ISDA Definitions, on which it relies and to which the swap here at issue was explicitly made subject, there is no merit to Veleron's suggestion.

"pounding ... its stock price falling more than 50 percent." (Cooper Dec. Ex. 52; Ex. 56; Ex. 57; Ex. 58.) Morgan Stanley's exposure to credit default swaps was deemed particularly problematic and potentially fatal for the venerable institution. The *New York Times* reported that, "Within three hours on Tuesday Sept. 16, [2008,] Morgan Stanley shares fell another 28 percent, and the rising cost of its credit-default swaps suggested investors were predicting bankruptcy." (Cooper Dec. Ex. 51.) On September 19, 2008, the *Wall Street Journal* reported that Morgan Stanley's chief executive was engaged in an "all-out fight to save the Wall Street firm ..." (Cooper Dec. Ex. 53.)

In September 2008, Magna's stock (like everyone else's) was declining in value. (Morgan Stanley 56.1 ¶ 26.) By the end of September, it had fallen enough to trigger a margin call. Therefore, at 4:38 p.m. on September 29, 2008, BNP sent a written notice of margin call to Veleron, demanding payment of $92,458,716 to cover the shortfall by 1:00 p.m. on October 1, 2008. (Def. 56.1 ¶ 33; Cooper Dec. Ex. 60.) As required by the Swap Agreement, BNP immediately notified Morgan Stanley about the margin call. (Pl. Counter 56.1 ¶ 67.)

At 8:23 a.m. on September 30, 2008 (i.e., the next morning, before the market opened) Morgan Stanley employee Alessandro Amicucci, a Managing Director in Morgan Stanley's Global Capital Markets group, e-mailed several of his co-workers—including Kevin Woodruff, a Managing Director in the group at Morgan Stanley responsible for disposing of the Pledged Collateral and the person ultimately responsible for overseeing any disposal under the Agency Disposal Agreement. The email was headed "URGENT: Project Pearl—MAGNA shares/ CLIENT NOT MEETING A MARGIN CALL."

(Cooper Dec. Ex. 18.) In pertinent part, Amicucci informed his co-workers that: "BNPP has called for a margin call yesterday (approx USD 93 MM)"; and "CLIENT (Oleg Deripaska's vehicle) is facing liquidity issue, so BNPP (together with hedging parties) would like to discuss ... early termination." (*Id.*) Amicucci went on to reveal that Veleron was asking BNP to restructure the loan, or seeking permission to make early repayment. In connection with those discussions, it was asking for a waiver of the September 29 Margin Call. (*Id.*)

Veleron takes the position that three facts—(1) BNP had made a $93 million margin call, (2) Veleron had a liquidity issue, and (3) Veleron was asking that the loan be restructured—were not generally known in the marketplace on September 30, 2008, and so qualified as inside information. (Pl. 56.1 ¶ 73.) Morgan Stanley contends that other firms monitoring Magna's stock price would (or, perhaps, should) have been able to conclude that a margin call might issue (Def. 56.1 ¶¶ 31–32), but it offers no evidence that anyone other than BNP, itself and the other three participants in the hedging syndicate were in fact aware of these momentous events. Morgan Stanley says nothing about whether Veleron's "liquidity issue" or the loan restructuring request were a matter of general knowledge.

All three of these three facts are indubitably "information obtained in relation to the [Credit] Agreement," and BNP was contractually required to keep all such information confidential, except as necessary to "discharging its responsibilities under the Agreement." As selling the collateral promptly in order to mitigate its damages was plainly one of BNP's "responsibilities under the Agreement," BNP was permitted to tell Morgan Stanley, its agent for the disposal of the collateral, that its ser-

vices might soon be required, together with related information. But BNP was supposed to have Morgan Stanley sign a confidentiality and nondisclosure agreement (known in the industry as an NDA) for the benefit of Veleron, as required by § 14.12(a)(c) of the Credit Agreement, before apprising Morgan Stanley of these facts. As far as the record reveals, BNP did not require—indeed, did not even ask—Morgan Stanley to sign an NDA.

The fact of the margin call (but not the other two facts) was information that BNP was required to disclose to Morgan Stanley under the terms of the Swap Agreement. Wearing that hat, Morgan Stanley had no contractual obligation to keep the information to itself. But while there may have been two hats, there was only one Morgan Stanley.

**Morgan Stanley Takes Short Positions on Some of the Magna Shares.**

Seventeen minutes after Amicucci sent his email, or at 8:40 a.m. on September 30, 2008, the message was forwarded to someone not on its original address list: Kerim Tuna, then a Vice President in Morgan Stanley's Institutional Equity Division. Lest Tuna overlook it, the email was flagged, indicating that it was of high importance. (Cooper Dec. Ex. 61; Pl. 56.1 ¶ 78.)

Tuna was a trader; he traded principally for Morgan Stanley's own account. (Pl. 56.1 ¶ 80.) He was responsible for managing Morgan Stanley's risk in connection with the BNP Credit Default Swap relating to the Magna financing. (Pl. 56.1 ¶ 79.)

At 10:12 a.m., after consulting with Woodruff, another Morgan Stanley Managing Director, Mohit Assomull, asked that a member of his team run a model for the

disposal of approximately 20%—$1.1 billion worth—of Magna stock. (Pl. 56.1 ¶ 91–92.)

At 11:42 a.m., Woodruff and Tuna both received an Excel workbook showing that Veleron would not be in a position to meet the margin call (Cooper Dec. Ex. 19.) This, of course, greatly increased the likelihood that the shares would have to be sold.

Fourteen minutes later, at 11:56 a.m., Tuna began shorting Magna stock for the benefit of Morgan Stanley, at an average price of $51.32 per share. (Pl. 56.1 ¶¶ 112–113.) An investor sells "short" when he borrows a security from someone else (typically a broker) and then sells it, hoping the stock will fall so that, at a later date, when the investor "covers" the short position by purchasing the security and returning it to the lender, he can capitalize on the price differential. *S.E.C. v. Lyon,* 605 F.Supp.2d 531, 536 (S.D.N.Y.2009) (citing *ATSI Communs., Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 96 n. 1 (2d Cir.2007)). Obviously, shorting Magna offered Morgan Stanley some cushion against the possibility of a loss on the Credit Default Swap Agreement.

The situation continued to deteriorate. At 4:44 p.m. on September 30, 2008, BNP issued an accelerated margin call to Veleron, demanding a payment of $113,825,691 (*i.e.,* an additional $21 million) by 1:00 p.m. on October 1, 2008. (Cooper Dec. Ex. 97.)

By the end of the day on September 30, 2008, Morgan Stanley had sold short 191,-505 Magna shares. (Def. 56.1 ¶ 28.) According to Veleron's expert Dr. Unni, Tuna's September 30 short sales depressed the price of Magna's stock by between $0.18 and $0.41 per share. (Pl. 56.1 ¶ 117.)[6] Magna stock opened at

---

**6.** This is a motion for summary judgment, so

I must view the facts most favorably to the

$52.69 on September 30; it closed at $51.19. (*See* http://www.magna.com/investors/shareholder-information/historical-price-lookup.)

**Restructuring Negotiations Continue As Morgan Stanley Shorts More Magna Stock**

Meanwhile, Veleron was negotiating with BNP try to restructure the margin loan. Restructuring negotiations occurred during conference calls on October 1 and October 2. (Pl. 56.1 ¶ 127.) Although it was not required to do so under the terms of the Swap, BNP insisted that all of the banks to which it had dispersed its risk, including Morgan Stanley, consent to any restructuring of the margin loan. (Pl. 56.1 ¶ 22.) As a result, Morgan Stanley (wearing its participation hat) was party to those discussions.

Critical to the success of the negotiations was a loan guarantee from someone with more assets than an SPV like Veleron. Basic Element, on behalf of RM, actually provided a signed guarantee on October 1, 2008 at 5:23 p.m.—although it would later take the position that the guarantee was invalid because it had not been approved by its Board. (Def. 56.1 ¶¶ 42–47.) Nonetheless, receipt of the guarantee allowed the restructuring discussions to continue into October 2.

But from the get-go, Morgan Stanley was not an enthusiastic participant in restructuring talks. Long before the negotiations ended—indeed, as early as 9:14 a.m. on October 1, which was almost 8 hours before the RM guarantee was tendered—Woodruff informed six other Morgan Stanley employees, including Tuna, that a "restructuring [was] looking less likely." (Cooper Dec. Ex. 106.) At least part of the reason why restructuring proved elusive was that Morgan Stanley's Chief Risk

Officer, Kenneth deRegt, did not favor any restructuring that would convert the Loan into a credit risk facing RM. (Pl. 56.1 ¶ 135.) In fact, Morgan Stanley wanted to pull the plug on the loan; but it wanted one of the other hedging banks or BNP to be the first to say no to restructuring. (Pl. 56.1 ¶ 138.) No one has said so explicitly, but its conflicting positions suggest one reason why Morgan Stanley might not have wanted to be the bank that ended negotiations.

Morgan Stanley was well aware that information about how the negotiations were (or were not) going would be market moving, and it demanded that the fact of the discussions and the impending liquidation sale be kept secret. Morgan Stanley was proposing to sell the shares in an ABB, an Advanced Book Building, which is a way to dispose of large blocks of stock quickly and otherwise than through a stock exchange. (Def. 56.1 ¶ 56–57.) During a telephone conference held on October 2, 2008, with representatives from BNP, and the other Participant banks on the line, someone asked whether Morgan Stanley had "any precautions ... buil[t] in to their normal ABB procedures to avoid front running risks?" (Cooper Dec. Ex. 111 at BNPP003887.) Morgan Stanley's Kevin Woodruff responded, "No ... I mean other than keep the group of people who are informed as small as possible." (*Id.*) His questioner asked, "Are they normally under NDAs or anything like that?" (*Id.*) Woodruff ultimately answered: "Obviously the critical thing for everybody on this call is not to leak this out to either people on your trading floors or to potential investors ahead of time because then the stock will probably take a nosedive very quickly. So the biggest precaution

nonmoving party, which is Veleron.

that we can all take is to keep this highly confidential." (Pl. 56.1 ¶ 164.)

Nonetheless, Tuna, with full awareness of what was happening with the restructuring discussions, continued selling Magna short. On October 1, 2008, Morgan Stanley shorted another 160,655 Magna shares for its own account, at an average price of $50.12 per share. (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 144.) Veleron's expert, Unni, contends that the October 1 short sales depressed the price of Magna stock by between $0.20 and $0.42 per share (Pl. 56.1 ¶ 149.), and that the sales from the two days had a statistically significant price impact on Magna's share price on October 2. (Unni Aff. ¶ 183.) He opines that the short sales signaled to the market that Morgan Stanley knew something that the rest of the market did not. (Unni Rep. ¶¶ 43–47.)

The closing price of Magna on October 1, 2008 was down to $49.75. (*See* http://www.magna.com/investors/shareholder-information/historical-price-lookup.)

**Default Not Cured, BNP Decides to Sell the Collateral**

Veleron did not meet the 1 PM margin call deadline on October 1. (Pl. 56.¶¶ 130–131.) Accordingly, BNP sent Veleron a letter on the afternoon of October 1, declaring that Veleron's failure to pay the margin call was an event of default. (Cooper Dec. Ex. 98.) As recounted above, negotiations continued nonetheless, and the RM guarantee was tendered.

Twenty-four hours later, at 1:00 p.m. on October 2, 2008, Morgan Stanley sent BNP a notice terminating the Credit Derivative Transaction. It was the first of the hedging banks to provide such a notice. (Pl. 56.1 ¶¶ 165–66.)

An hour later, at 2:00 p.m. on October 2, 2008, BNP told the other banks that Russian Machines' board had not approved the guarantee, and that it would not be honored. (Pl. Response to Def. 56.1 ¶ 48.) After it became clear that the guarantee would not be honored, BNP sent Veleron a second Notice of Default, informing Veleron that "if payment or arrangements satisfactory to the Agent for payment are not made by 8:00 p.m. (Toronto time) [7] [BNP] will take such steps as it deems necessary to recover (Veleron's) indebtedness" including "enforcement of the security under the pledge and security agreement." (Def. 56.1 ¶ 49.)

But there would be no waiting until 8 p.m. Toronto time. Once Morgan Stanley notified representatives from BNP and the other banks that it had sent a notice terminating the Swap, a representative from BNP stated: "I mean it's one for all and all for one. If one party drops out it's the whole pack of cards comes down, the house of cards comes down. So if that's the situation so be it, we're in a liquidation scenario." (Cooper Dec. Ex. 27 at BNPP004195.) At 3:56 p.m., four hours before Veleron's deadline, BNP instructed Morgan Stanley to liquidate the pledged collateral. (Def. 56.1 ¶ 50.)

The closing price of Magna on October 2, 2008 fell to $45.59. (Cooper Dec. Ex. 118.)

**Morgan Stanley Liquidates the Pledged Collateral, Primarily Through Off-Market Transactions.**

Between 7:00 a.m. and 9:30 a.m. on October 3, 2008 (i.e., before the market opened), Morgan Stanley, acting on behalf of BNP under the Agency Disposal Agreement, liquidated 18,671,512 Magna shares

---

**7.** Toronto and New York City are in the same time zone and would both have been on Eastern Daylight Time on October 2, 2008.

at an average price of $37.60 in the ABB. (Pl. 56.1 ¶¶ 176, 179–80.) Morgan Stanley provided an initial offer range of $39 to $42.50 in the ABB, representing a 7–14% discount from the previous day's closing price. (Cooper Dec. Ex. 34 at 208.) The average per share price in the ABB was $37.60 per share, or lower than the range. (Pl. 56.1 ¶¶ 179–80.)

Morgan Stanley covered its short positions by purchasing approximately 360,000 shares in the ABB, thereby realizing a profit of approximately $4.59 million dollars. (Unni Report ¶¶ 40–41.)

When the market opened, a press release disclosed the fact of the liquidation. The parties agree that, "Prior to the launch of the ABB, it was not publicly known that there would be disposal of 20 million shares of Magna." (Id. ¶ 178.)

Morgan Stanley liquidated the remainder of the pledged collateral by selling 1,328,488 shares on the NYSE (during regular trading hours) at an average price of $41.65 per share. (Pl. 56.1 ¶ 181.)

In total, the liquidation brought in $748 million, leaving a deficiency of $79 million on the margin loan. (Def. 56.1 ¶¶ 60–61.)

As the loan could not be repaid in full from the proceeds of the liquidation, Morgan Stanley was required to pay BNP $6.6 million under the Swap. (Def. 56.1 ¶ 62.) However, by covering its short positions in the ABB, however, Morgan Stanley had mitigated its loss on the Swap to the extent of $4.59 million, leaving it with an overall loss of approximately $2 million on the Swap. (Id. ¶ 63.) For its services as disposal agent, Morgan Stanley was paid a fee of $9,466,433.50. (Pl. 56.1 ¶ 190.) It also earned $590,000 in commissions as a result of the liquidation. (Id. ¶ 191.) All in all, Morgan Stanley made about $8 million under its various contracts with BNP regarding Veleron/Magna.

### BNP's Effort to Collect the Deficiency

On October 6, 2008, BNP sent a letter to Veleron demanding payment of the "deficiency of $79,373,574.68," with interest. (Pl. Counter 56.1 ¶ 184.)

Veleron did not pay, and BNP made no further efforts to recover any deficiency amounts from Veleron. (First Amended Complaint ¶ 177.) This was a perfectly sensible decision; as Veleron was an SPV, there was not much point in going after it.

Instead, after collecting approximately $7.8 million from its insurance carrier (Ex. 42 to the First Amended Complaint), BNP initiated an arbitration proceeding in London against RM, seeking to recover the deficiency by enforcing the guarantee that had been tendered on October 1. (Id. ¶ 65.) The arbitrator found the guarantee to be valid and binding and held Russian Machines liable for the entire deficiency. To frustrate BNP's ability to collect on its award, Deripaska promptly placed that corporation into insolvency proceedings in Russia. (Id. ¶¶ 66–67.)

### Procedural History

Veleron commenced this lawsuit on August 3, 2012.

In addition to Morgan Stanley, Veleron originally named as defendants BNP Paribas SA, BNP Paribas Fund Services UK Limited, BNP Paribas Trust Corporation UK Limited, BNP Paribas UK Limited, BNP Paribas Commodity Futures, Ltd., Investment Fund Services Limited, BNP Paribas London, BNP Paribas NY, Credit Suisse, Credit Suisse International, Credit Suisse AG, Credit Suisse Group, Nexgen/Natixis Capital Limited, Groupe BPCE, Natixis North America, LLC, Natixis Financial Products, Inc., ABN AMRO Bank, N.V., ABN AMRO Bank Holding, N.V., ABN Amro Holdings, N.V., ABN AMRO Clearing Bank, N.V., ABN AMRO Clearing Chicago, LLC, ABN AMRO

Holdings USA, LLC, ABN AMRO Securities (USA) LLC, ABN AMRO Capital USA, LLC, ABN AMRO Funding Services USA, LLC, The Royal Bank of Scotland N.V., The RBS Group, The Royal Bank of Scotland Group, LLC, RFS Holdings, B.V., Fortis Bank (Nederland) N.V., and Magna International, Inc.

Following an initial pretrial conference on September 21, 2012, Morgan Stanley, together with Credit Suisse International ("Credit Suisse"), Nexgen/Natixis Capital Limited ("Nexgen"), The Royal Bank of Scotland N.V., and BNP, made a motion to stay this case pending the outcome of the London Arbitration. I denied that motion on October 12, 2012.

On November 16, 2012, the same defendants moved to dismiss Veleron's complaint. On November 19 and 20, certain additional defendants were voluntarily dismissed from this action without prejudice.

On December 7, 2012, before the motions to dismiss could be resolved, Veleron filed the First Amended Complaint. It alleged the following causes of action:

- Count 1: breach of contract against BNP (Credit Agreement);

- Count 2: tortious interference with contract against Morgan Stanley and the Foreign Bank Defendants (Credit Agreement);

- Count 3: breach of contract against BNP (Pledge Agreement);

- Count 4: breach of contract against Morgan Stanley (Pledge Agreement and Agency Disposal Agreement);

- Count 5: breach of contract against BNP (Forbearance Agreement);

- Count 6: promissory estoppel against BNP (forbearance);

- Count 7: tortious interference with contract against Morgan Stanley (Forbearance Agreement);

- Count 8: tortious interference with prospective economic advantage against all defendants (Veleron's relationship with Magna); and

- Count 9: Securities Exchange Act of 1934 Section 10(b) and Rule 10b–5 violations against Morgan Stanley.

Morgan Stanley, together with Credit Suisse International ("Credit Suisse"), Nexgen/Natixis Capital Limited ("Nexgen"), The Royal Bank of Scotland N.V., and BNP, moved to dismiss the FAC on January 18, 2013. All but Morgan Stanley moved to dismiss on the grounds of *forum non conveniens* and failure to state a claim (Rule 12(b)(6)). Morgan Stanley moved solely for failure to state a claim.

On May 16, 2013, I dismissed all claims against Credit Suisse, Nexgen, RBS and BNP on *forum non conveniens* grounds. (Docket # 117) I dismissed Veleron's tortious interference claims against Morgan Stanley as time barred.[8] I dismissed Veleron's claim that Morgan Stanley breached the Pledge Agreement because Morgan

---

8. On September 26, 2014, Plaintiff Veleron Holding, B.V. ("Veleron") commenced a separate action in New York Supreme Court, New York County, against Defendants Morgan Stanley, Morgan Stanley Capital Services, LLC, and Morgan Stanley & Co., LLC (collectively, "Morgan Stanley"), by filing with the New York Supreme Court a Summons with Notice. (Notice of Removal, Docket # 1 in 14 Civ. 7874(CM), Ex. A.) On September 30, 2014, four days after Veleron filed its Summons with Notice, Morgan Stanley filed a notice of removal in this court. (Docket # 1 in 14 Civ. 7874.) Veleron then moved to remand the action to state court. (Motion for Remand, Docket # 9 in 14 Civ. 7874.) On November 13, 2014, I granted Veleron's motion to remand that action back to state court. I have no idea what is going on in the New York State Supreme Court; no one has seen fit to advise me.

Stanley was not bound by that agreement. I also dismissed Veleron's claim that Morgan Stanley breached the Agency Disposal Agreement, because Veleron was neither a party to that agreement nor an intended third party beneficiary.

What remained was Veleron's claim that Morgan Stanley had committed securities fraud, either through insider trading or market manipulation.

After the London arbitration tribunal entered an award in favor of BNP, finding Russian Machines liable under its guarantee for the entire deficiency. Morgan Stanley moved for summary judgment, arguing that Veleron was collaterally estopped to pursue its claims by virtue of several statements made by the arbitrator in his Award. I denied that motion on April 2, 2014.

At the close of discovery, Morgan Stanley moved for summary judgment, as well as for an order striking the testimony of Veleron's expert witnesses, Unni and MacLaverty. Those motions are disposed of as follows.

## DISCUSSION

### I. Veleron Has Article III Standing To Pursue Its Securities Claims Against Morgan Stanley.

Morgan Stanley first argues that Veleron lacks constitutional standing to bring its claim. Because constitutional standing is a jurisdictional requirement, I must address this issue first. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 156 (2d Cir.2003).

■ Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. The Supreme Court has Interpreted this case and controversy limitation to require that plaintiffs possess "standing" to bring a suit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To establish standing, a plaintiff must show (1) an "injury in fact" which is "concrete and particularized"; (2) a "causal connection" between the injury and allegedly wrongful conduct; and (3) that the injury can be "redressed by a favorable decision." *Id.* at 560–61, 112 S.Ct. 2130 (internal citations and quotation marks omitted).

■ Veleron identifies its "injury in fact" as the size of the deficiency for which It was and remains liable; plaintiff argues that the deficiency would have been much less but for Morgan Stanley's insider trading and market manipulation. Morgan Stanley counters that Veleron lacks an "injury in fact," because the loan from BNP was a non-recourse loan, so Veleron was never liable for any deficiency. (Def. Br. at 24.) Further, Morgan Stanley argues, Veleron has not established that "it personally has suffered [an] injury in fact" insofar as it never paid the deficiency on the loan. *Clinton v. City of New York*, 524 U.S. 417, 457, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Scalia, J., concurring in part and dissenting in part).

Morgan Stanley is wrong about the loan's being a non-recourse loan.

■ A recourse loan is one "in which . . . the lender agrees to look exclusively to the collateral, and never to dun the borrower for a deficiency if a sale of the collateral fetches less than the balance." *Racine v. Comm'r*, 493 F.3d 777, 781 (7th Cir.2007). Generally, courts characterize debts as non-recourse only when that character is apparent from the language of the instrument creating the debt. *Fid. Mut. Life Ins. Co. v. Chicago Title & Trust Co. of Chicago*, No. 92 Civ. 8475, 1994 WL 494897, at *5 n. 1 (N.D.Ill. Sept. 7, 1994).

The fact that a debtor lacks the wherewithal to repay a loan does not make it a non-recourse loan—even though the lender knows at the time it lends the money that the debtor has no assets other than the loan collateral and will only be able to repay the loan to the extent of the value of the collateral. *In re Parmalat Securities Litigation*, 477 F.Supp.2d 602 (S.D.N.Y. 2007).

■ Morgan Stanley points to no language in the Credit or Pledge Agreements that renders the loan non-recourse as against Veleron, the Borrower. But Veleron identifies language in the agreements that indicates the contrary. For example, § 11.3 of the Credit Agreement explicitly make the loan a recourse loan as against Veleron. It provides that, as against the Borrower (Veleron), BNP "may . . . bring suit at law, in equity or otherwise, for . . . the recovery of any *judgment for any and all amounts due in respect of the Obligations.*" (Credit Agreement at 46 (emphasis added).) "Any and all amounts due in respect of the Obligation" means what it says: BNP can sue Veleron for the full amount due under the loan, including any deficiency after the sale of the pledged collateral.

Similarly, Section 4.4(3) of the Pledge Agreement provides that, aside from the right to realize on the collateral, the "Agent and Lenders shall not have any claim against Newco, Newco 1.5, Newco II or any of their assets." (Pledge Agreement at 11; *see also* Credit Agreement at 33.) "Shall not have any claim against" is classic non-recourse language, but it applies only to the three Newcos. Veleron's name is conspicuously absent from the list of companies as to whose assets no recourse can be had. That means there is no such limitation on recovery against Veleron.

Morgan Stanley ignores the text of the Agreements, arguing instead that Veleron's witnesses testified to their understanding that BNP had recourse only to pledged collateral if Veleron defaulted. (*See, e.g.,* Polkes Decl. Ex. 1 ("Moldazhanova Dep. Tr.") at 33:10–16, 151:3–22.) Morgan Stanley also cites the Investor Pack, which advises that "Should Veleron and Newco II go bankrupt, the only assets to which the transaction has recourse are the 20 million Magna Shares together with any cash collateral delivered under the financing [and any amount under the Guarantee (currently under negotiation) given by Russian Machines to BNP Paribas]." (Investor Pack at 20.)

All of this is parol evidence, which is not admissible to vary or modify the unambiguous terms of the Agreements—and they are indeed unambiguous, as the contract expressly provides that BNP "may . . . bring suit at law, in equity or otherwise, for . . . the recovery of any *judgment for any and all amounts due in respect of the Obligations.*" (Credit Agreement at 46 (emphasis added).). The Credit Agreement is governed by Canadian law, and Canada, like the United States, requires that unambiguous contracts be interpreted without recourse to evidence beyond the four corners of a contract. *See* Canadian Encyclopedic Digest—Contracts § IX.2.(b).

Of course, as a practical matter, Veleron's witnesses and the Investor Pack spoke true: since Veleron, an SPV, had minimal or no assets other than the Magna stock, suing Veleron for any deficiency would be throwing good money after bad. But that does not obviate Veleron's injury, because it does not obviate its legal liability for the deficiency. While uncollectability often proves a potent shield against suit, it is not a defense to legal liability, and

legal liability is what matters for standing purposes.

This precise issue was litigated years ago before my colleague, Judge Kaplan, in *In re Parmalat Securities Litigation*, 477 F.Supp.2d 602 (S.D.N.Y.2007). The plaintiffs in that case were, like Veleron, two special purpose entities created solely to acquire the stock in a holding company for Parmalat's Brazilian operations. *Id.* at 605. The plaintiffs financed their purchases of holding company stock by issuing $150 million notes, secured by the stock. *Id.* at 605–06. Parmalat collapsed as a result of a fraudulent scheme, and, as a result, the value of its stock crashed and the plaintiffs defaulted. They sued entities including Bank of America—which had helped to form the SPVs and allegedly was instrumental in the issuance of notes and the matrix of security agreements relating to them—on theories of fraud, negligent misrepresentation, aiding and abetting breach of fiduciary duty, unjust enrichment, and civil conspiracy.

■ Defendants moved to dismiss the complaint filed by the two SPVs for lack for standing, arguing that the plaintiff entities, as mere pass-through vehicles, suffered no injury. The real injured parties, they argued, were the noteholders who purchased the paper from plaintiffs. Judge Kaplan rejected that argument: "Although the Noteholders allegedly have been injured from the loss of their investments, this does not eliminate the Companies' injury of incurring a legal obligation they are unable to meet." *Id.* at 608. That injury, Judge Kaplan explained, was personal to the plaintiff SPVs, and was sufficient for purposes of Article III. *Id.* Thus, Judge Kaplan had subject matter jurisdiction to hear the suit, *id.*, a question that exists apart from whether plaintiffs have a cause of action. *See Davis v. Passman*, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (noting that question of whether a plaintiff has standing to bring suit, and thus whether the court has jurisdiction to hear the controversy, is separate from the question of whether a plaintiff has a cause of action, and that constitutional standing may exist even where a cause of action does not).

Here, Veleron is similarly situated to the special purpose entities in *Parmalat*. Even though BNP (the Lender) and its guarantor (Russian Machines) suffered more obvious and tangible losses, Veleron is nonetheless liable for the deficiency on the loan—even if it does not have the assets to pay off its debt. That liability is real. And it confers Article III standing on Veleron.

As for injury in fact: The purportedly greater deficiency on the loan is the harm alleged in connection with both of Veleron's claims: market manipulation and insider trading. Thus, Veleron has demonstrated an injury in fact sufficient to permit it to pursue both claims.

■ There is an alternative basis to find that Veleron has constitutional standing on its insider trading claim—which, as I explain below, is the only claim that survives Morgan Stanley's motion for summary judgment. Veleron has Article III standing to pursue its insider trading claim because the claim rests on a misappropriation theory—that is, Morgan Stanley caused it personal harm by exploiting Veleron's own confidential information (its liquidity issue), to which Veleron had a personal property right of exclusive use. The theory of misappropriation is premised on that property right: "A company's confidential information qualifies as property to which the company has a right of exclusive use; the undisclosed misappropriation of such information constitutes fraud akin to embezzlement." *O'Hagan*, 521 U.S. at 643, 117 S.Ct. 2199. The Sev-

enth Circuit has held that the trespass of that right of exclusive use is itself an injury for purposes of Article III, finding that "misappropriation constitutes a distinct and palpable injury that is legally cognizable under Article Ill's case or controversy requirement." *FMC Corp. v. Boesky*, 852 F.2d 981, 989–90 (7th Cir.1988).

The case on which Morgan Stanley relies, *Frankel v. Slotkin*, 984 F.2d 1328, 1334 (2d Cir.1993), is not to the contrary. Morgan Stanley cites *Frankel* for the proposition that "misappropriation of confidential information belonging to the corporation does not give rise to a Rule 10b–5 claim on behalf of the corporation when it was not injured by the fraud." But that case considered the statutory elements of a securities fraud claim (which include a damages element), not constitutional injury. Morgan Stanley seeks to elide the statute's damages requirement and the constitution's injury requirement because, as it points out again and again, Veleron has not paid any of the deficiency on the loan. But Veleron has presented evidence of statutory damages. Damages under the securities fraud statute are

> determined by use of the "out-of-pocket" measure for damages ... The Supreme Court adopted the out-of-pocket measure of damages in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Referring to 15 U.S.C. § 78bb(a)(1), which limits recovery to "actual damages" for violations of the Securities Exchange Act of 1934, the Supreme Court held that "the correct measure of damages under § 28 of the Act, 15 U.S.C. § 78bb(a), is the difference between the

fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Id.*

*Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012). Recall that Veleron here was a forced seller. Veleron has presented expert evidence that Morgan Stanley's short sales depressed the price of the stock before the sales that Veleron was forced to make—thus creating a "difference between the fair value of all that [Veleron] ... received and the fair value of what he would have received had there been no fraudulent conduct." According to Veleron's expert, this amounts to many millions of dollars.[9]

Thus, even if Morgan Stanley's reading of *Frankel* were correct (which it is not), there would be Article III standing here.

## II. Summary Judgment: Applicable Standards

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see* FED. R. CIV. P. 56(a), (c). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**9.** Veleron contends that the reduction in Magna's market price resulting from Morgan Stanley's September 30 and October 1 short sales reduced the amount realized from the liquidation (and thereby increased the deficiency) by between $5.8 million and $12.6 million. (Pl. 56.1 ¶ 182.) Veleron's expert makes these calculations using a weighted average of the shares sold via ABB and the remaining shares sold on the NYSE. (Cooper Dec. Ex. 88 82–86.)

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. "Summary judgment is designed ... to flush out those cases that are pre-destined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997).

### III. Morgan Stanley is Not Entitled to Summary Judgement Dismissing Veleron's Insider Trading Claim.

Section 10(b) of the Securities Exchange Act of 1934 makes it "unlawful for any person ... To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe ...." 15 U.S.C. § 78j. SEC Rule 10b–5, which implements Section 10(b), prohibits the use of "any device, scheme, or artifice to defraud" or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

"Insider trading—unlawful trading in securities based on material non-public information—is well established as a violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5." *S.E.C. v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012).

The Supreme Court has recognized that Section 10(b) "affords a right of action to purchasers or sellers of securities injured by its violation." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Moreover, "defaulting pledgors ... with only a partial right to the proceeds of the sale of their stock, [have standing] to sue as 'sellers' under Rule 10b–5 when their stock is sold to pay off the loan against which the stock was pledged." *Madison Consultants v. Fed. Deposit Ins. Corp.*, 710 F.2d 57, 61 (2d Cir.1983); *see also Dopp v. Franklin Nat. Bank*, 374 F.Supp. 904, 909 (S.D.N.Y. 1974). Thus, Veleron is a "forced seller" and falls within the "purchaser-seller" requirement of Rule 10(b). *See id.*

There are two theories of insider trading.

Under the "classical theory ... a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." *Id.* Veleron does not argue that Morgan Stanley is liable on that theory.

■ Instead, Veleron presses the "misappropriation" theory endorsed by the Supreme Court in *United States v. O'Hagan*, 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). That theory is "designed to protec[t] the integrity of the securities markets against abuses by 'outsiders' to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders." *O'Hagan*, 521 U.S. at 653, 117 S.Ct. 2199 (1997). Misappropriation doctrine "clothes an outsider with temporary insider status when the outsider obtains access to confidential information solely for corporate purposes in the context of 'a special confidential relationship.'" *Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 169 (2d Cir.1999) (quoting *United States v. Chestman*, 947 F.2d 551, 565 (2d Cir.1991) (*en banc*) (internal citations omitted)). "[F]or purposes of both civil and criminal enforcement actions under § 10(b) of the 1934 Act and Rule 10b–5 ... 'misappropriat[ing]' confidential information for securities trading purposes, in breach of a duty owed to the source of the information,'" results in liability for the misappropriator. *United States v. Gansman*, 657 F.3d 85, 90–91 (2d Cir.2011) (quoting *O'Hagan*, 521 U.S. at 652, 117 S.Ct. 2199).

■ To prevail on a misappropriation insider trading claim, a plaintiff must "establish (1) that the defendant possessed material, nonpublic information; (2) which he had a duty to keep confidential; and (3) that the defendant breached his duty by acting on or revealing the information in question." *S.E.C. v. Lyon*, 605 F.Supp.2d 531, 541 (S.D.N.Y.2009) (citing *United States v. Falcone*, 257 F.3d 226, 232–33 (2d Cir.2001)).

Morgan Stanley argues that Veleron fails to raise a genuine issue of fact as to any of these three elements. Morgan Stanley also argues that Veleron has failed to present any competent evidence of loss causation or damages. Finally, Morgan Stanley urges that Veleron lacks standing to pursue a misappropriation insider trading claim on what is referred to as *Lyon/Talbot* analysis, which is one of the arguments Veleron makes.

## A. Veleron Has Raised a Question of Fact Concerning Whether the Information It Identifies as "Non-Public" Was Material.

An insider trading violation under Section 10(b) and Rule 10b–5 requires that the trading occur on the basis of "material, nonpublic information." *Obus*, 693 F.3d at 284.

■ "The determination of materiality is a mixed question of law and fact that generally should be presented to a jury." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999); *SEC v. Collins & Aikman Corp.*, 524 F.Supp.2d 477, 488 (S.D.N.Y.2007) ("the materiality question is not often amenable to disposition as a matter of law." (citing *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir.2002))). "Only if no reasonable juror could determine that the undisclosed [information] would have assumed actual significance in the deliberations of the reasonable [investor] should materiality be determined as a matter of law." *Id.* (second alteration in original; internal quotation marks omitted); *but see Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F.Supp. 976, 989 (S.D.N.Y.1989) (Information may be immaterial as a matter of law, for example where "a prospective merger is too inchoate to be material.") (citing *Basic*, 485 U.S. at 240–41, 108 S.Ct. 978).

■ Nonetheless, Morgan Stanley argues that the information identified by Veleron as market-moving non-public information was in fact immaterial, both as a matter of undisputed fact and as a matter of law. It is wrong on both counts. By pointing to the words and deeds of Morgan Stanley's own personnel at the time when the alleged insider trading was taking place, Veleron has at the very least raised a genuine issue of fact on the question of materiality. And Morgan Stanley has not come close to demonstrating that the identified non-public information was immaterial as a matter of law.

First, the facts.

■ Information is material if " 'there is a substantial likelihood that a reasonable shareholder would consider it important' or, in other words, 'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the total mix of information available.' " *SEC v. DCI Telecomms., Inc.*, 122 F.Supp.2d 495, 498 (S.D.N.Y.2000) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)); *accord ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir.2009).

Here, there is plenty of evidence—most of it out of the mouths of Morgan Stanley's own personnel—from which a jury could conclude that the non-public information in this case was material as a matter of fact.

Veleron alleges that Morgan Stanley sold short while in possession of the following nonpublic information: (1) the fact of BNP's margin call; (2) Veleron's purported liquidity issue; and (3) the outlines of a restructuring proposal. Morgan Stanley does not dispute that this information was not yet in the public domain.

Apprised of this information, a reasonable investor could readily conclude that Magna's 20% shareholder was about to default on its loan, and fully one fifth of Magna's outstanding shares would soon flood the market. Construing the evidence in the light most favorable to the nonmoving party, that would be enough to "significantly alter[ ] the total mix of information available" in the marketplace for Magna stock. *Basic*, 485 U.S. at 232, 108 S.Ct. 978.

But there is more.

■ A "major factor" in determining the materiality of information is "the importance attached to it by those who knew about it." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir.1997). "[W]here there is a question of whether certain information is material, courts often look to the actions of those who were privy to the information in determining materiality." *SEC v. Rorech*, 720 F.Supp.2d 367, 412 (S.D.N.Y.2010); *SEC v. Geon Indus.*, 531 F.2d 39, 48 (2d Cir.1976) (individuals "demonstrated the importance they attached to the information by purchasing shares").

Here, Morgan Stanley trader Kevin Woodruff cautioned others to keep information regarding the restructuring negotiations confidential because, if it were leaked, Magna's share price would "take a nosedive very quickly." (Veleron 56.1 ¶ 164.) Another Morgan Stanley employee had previously marked the information "urgent" and forwarded it to various highly placed Morgan Stanley employees in e-mails flagged for their high importance. (*Id.* ¶¶ 68, 74, 76–77, 83–84, 87, 105.)

Most telling of all is the fact that, almost as soon as its in-house account traders became aware of these potentially market-moving events—but days before the market did—Morgan Stanley began taking short positions on Magna stock, to hedge

against the loss it faced as a result of its exposure to 8.1% of the defaulted loan by virtue of its Swap agreement. Actions speak louder than words, and that particular action speaks volumes.

Morgan Stanley's only response is to argue that the information was material only to Morgan Stanley—not to any other "reasonable investor:"

> it is hardly remarkable that, when faced with the possibility that it might suffer a substantial loss on its Swap with BNP, Morgan Stanley treated the matter seriously. This has nothing to do with what a 'reasonable investor' with no swap exposure would view as material regarding trading decisions in Magna.

Def. Reply at 22. Rarely have I heard a sillier argument. Morgan Stanley essentially admits that the information was material to it, because it was exposed to the swap. Other investors may not have been exposed to that precise risk, but were exposed to a related risk—the risk that Magna's stock price would drop (or, to use Woodruffs more colorful word, "nosedive") if BNP flooded the market with unwanted Magna stock in the middle of a financial meltdown. Morgan Stanley was unquestionably acting like a reasonable investor when it hedged its Swap exposure by placing a "bet" that was really no bet at all, since it had information tending to suggest that Magna's stock price was going to fall. Other reasonable investors who owned high priced Magna shares (remember, the stock was trading at $51 on September 29, 2008) would have wanted to know exactly the same thing.

In sum, the expressed belief of Morgan Stanley employees that public disclosure of this information would roil the market, coupled with that fact that it took measures to protect itself from what a fall in the market price would do to its exposure under the Swap, at the very least create a genuine issue of material fact about the materiality of the information that was known to Morgan Stanley but not to the rest of the market.

Morgan Stanley wants to put all this to one side. It argues that the information is immaterial "as a matter of law" because its expert performed a regression "event study" that discerned no statistically significant impact on the stock's price after the information was disclosed to the market on October 3, 2008—after the ABB.

Morgan Stanley's argument rests on a case from the Eastern District of Pennsylvania, which in turn relies on a Third Circuit decision written by then-Circuit Judge Alito in *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir.1997). In that case, Judge Alito held that:

> to the extent that information is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price. [If] ... release of information had no effect on [the] stock price ... [that] is, in effect, a representation that the information was not material.

To Morgan Stanley, Judge Alito's decision compels the conclusion that information is immaterial as a matter of law in the absence of immediate post-disclosure stock price movement. *S.E.C. v. Berlacher,* No. CIV.A.07–3800, 2010 WL 3566790, at *7 (E.D.Pa. Sept. 13, 2010) (citing *Burlington* for the rule that if "there is no movement in the stock price, then the disclosed information is immaterial as a matter of law."). It then asserts that, because Veleron offers no evidence of such a movement (in the form of its own "event study"), there is nothing for a jury to try.

An event study is "a regression analysis that examines the effect of an event on some dependent variable, such as a corpo-

ration's stock price." *RMED Int'l Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 PKL RLE, 2000 WL 310352, at *6 (S.D.N.Y. Mar. 24, 2000), *aff'd.*, No. 94 Civ. 5587 PKL RLE, 2000 WL 420548 (S.D.N.Y. Apr. 18, 2000). "Event studies are used to determine whether 'the price changes at issue in [a] case were [related or] unrelated to the representations in dispute' by eliminating other factors, such as 'the effects on stock price of market and industry information.'" *United States v. Martoma*, 993 F.Supp.2d 452, 457–58 (S.D.N.Y.2014) (quoting *In re N. Telecom Ltd. Sec. Litig.*, 116 F.Supp.2d 446, 460 (S.D.N.Y.2000)). "In other words, event studies seek to 'disentangle[ ] ... the stock price movement (if any) attributable to the release of new, allegation-related information from the movement attributable to the release of other, non-allegation-related news.'" *Id.* (quoting *In re Xerox Corp. Sec. Litig.*, 2009 WL 8556135, at *4).

Morgan Stanley is correct that event studies have become "almost obligatory" evidence in securities practice. *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F.Supp.2d 352, 364 (S.D.N.Y.2009). However, they are not *actually* obligatory. And while they may be dispositive in the Third Circuit, they are simply part of the evidentiary mix in the Second.

■ Long ago, the United States Supreme Court rejected the idea that any single fact or occurrence would always be determinative of materiality:

> Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive. In *TSC Industries* [*Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ] this Court explained: 'The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him ...' After much study, the Advisory Committee on Corporate Disclosure cautioned the SEC against administratively confining materiality to a rigid formula. Courts also would do well to heed this advice.

*Basic, Inc. v. Levinson*, 485 U.S. 224, 236, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citations omitted). In keeping with this multifactor approach, the courts in this Circuit treat event studies as what they are: one piece of evidence in a total mix of evidence (to borrow a pertinent phrase) that a jury may consider when determining the materiality of non-public information. For example, in *United States v. Ferguson*, 676 F.3d 260 (2d Cir.2011), the Second Circuit found that the government could have established materiality in one of two ways: either by offering expert testimony about a disclosure's effect on the stock price, or by relying on its other materiality evidence, which consisted of the testimony of two stock analysts and an investor—relations manager, all of whom attested to "the importance of [the kind of] information [at issue] to investors and analysts." *Id.* at 274–75 n. 11. The Second Circuit concluded that this non-event study evidence constituted "substantial" evidence of materiality, and, if a jury believed it, would have sufficed to prove materiality at trial. *Id.*

■ The ruling in *Ferguson* is consistent with this Circuit's approach to materiality analysis in the context of misrepresentations or omissions in public filings. Stock price movement is some evidence of materiality, but it is not in and of itself conclusive. In *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.1991), for example, the Circuit held that stock price movement following disclosure of non-public information (or lack of same) "does not

establish the materiality of the statements made, though stock movement is a factor the jury may consider relevant." (citing *Akerman v. Oryx Communications, Inc.*, 609 F.Supp. 363, 368 (S.D.N.Y.1984), *aff'd*, 810 F.2d 336 (2d Cir.1987)). Similarly, in *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 15–16 (2d Cir.1977), the Court of Appeals said, "Nor can the lack of a significant drop in the price of Oryx's stock after disclosure by itself establish immateriality as a matter of law."

While the Second Circuit has never expressly rejected *Burlington*, the Third Circuit's rule "is a matter of significant doubt in this Circuit. Our Court of Appeals has warned against taking an overly rigid approach to the inherently fact-bound materiality determinations." *In re Take–Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 291–92 (S.D.N.Y.2008) (citing *S.E.C. v. Penthouse Int'l, Inc.*, 390 F.Supp.2d 344, 353 (S.D.N.Y.2005)).

The Ninth Circuit *has* specifically rejected *Burlington* on the ground that the Third Circuit's approach contravenes *Basic*:

Pursuant to *Basic*, we reject Defendants' argument for adoption of a bright-line rule requiring an immediate market reaction. The market is subject to distortions that prevent the ideal of "a free and open public market" from occurring As recognized by the Supreme Court, these distortions may not be corrected immediately.... Because of these distortions, adoption of a bright-line rule assuming that the stock price will instantly react would fail to address the realities of the market. Thus, we decline to adopt a bright-line rule, and, instead, engage in the "fact-specific inquiry" set forth in *Basic*. *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir.2003) (internal citations and quotations omitted).

So the fact that Morgan Stanley has submitted an event study suggesting that the disclosure of the non-public information had no impact on the price of Magna's stock, while not irrelevant to the question of materiality, is also not determinative. It is simply part of the "total mix" of evidence.

Furthermore, in this case Morgan Stanley's study may turn out not to be particularly relevant. Unlike the cases cited by Morgan Stanley, in which event studies have been deemed important, this is not a "fraud on the market" insider trading case. Instead, it is a "fraud on Veleron" insider trading case, in which Veleron posits that a conflicted Morgan Stanley traded on confidential information and thereby worked a very particular injury on Veleron, measured by the decline in the price of Magna stock over the three days prior to public disclosure. On Veleron's theory of the case, by the time the market became aware of information that was potentially market-moving, the ball game was essentially over. More than 18 million Magna shares were liquidated in the ABB before any announcement was made, with Morgan Stanley—which controlled both the timing and the price of that sale—using the ABB as the vehicle to cover the short positions it had previously taken, on the basis of information that was not known to the market.

Furthermore, Dr. Sanjay Unni, Veleron's expert, testified that Morgan Stanley effectively communicated to the market that Veleron's price was likely to go down, simply by taking large short positions in Magna on September 30 and October 1. (*See* Unni Rep. ¶¶ 43–47.) Were a jury to accept this testimony—and since Magna's stock began falling once Morgan Stanley started shorting it, a jury might find it persuasive—then Morgan Stanley's study about what happened after the ABB was

disclosed on October 3 would be of little relevance to materiality.[10]

Of course, Morgan Stanley wants Dr. Unni's damning testimony stricken—largely because of his methodology—and has moved to exclude it. I need not rule on that issue now, since Veleron has raised a genuine issue of fact on the basis of Morgan Stanley's own statements, without relying on anything Dr. Unni says. I thus deny the motion to strike Dr. Unni's testimony. We will undoubtedly have to hold a *Daubert* hearing if Morgan Stanley renews this application *in limine*. Now is simply not the time to deal with it.

Finally, Morgan Stanley argues that, if Veleron was not in fact experiencing a "liquidity issue" in the days leading up to the ABB, the information that it identifies as non-public could not possibly be material. The argument rests on a faulty premise: "The fact that the inside information received by plaintiffs was allegedly false 'is quite beside the point.'" *In re Haven Indus., Inc.*, 462 F.Supp. 172, 178–79 (S.D.N.Y.1978) (quoting *Nathanson v. Weis, Voisin, Cannon, Inc.*, 325 F.Supp. 50, 54 (S.D.N.Y.1971)). In any event, the information that altered the "total mix" of information available was the fact that Veleron had defaulted on its obligation to meet BNP's margin call and was not going to cover—and that the loan was going to be called because BNP's Participants (following the lead of Morgan Stanley) refused to permit restructuring. That is what Morgan Stanley knew that the mar-

ket generally did not; that is the reason why Morgan Stanley shorted Magna stock at prices higher than the ABB or October 3 market price; and that information turned out to be true.

For all these reasons, Morgan Stanley's motion for summary judgment on the ground that the information known to it was not material is denied.

**B. Veleron Has Raised a Genuine Issue of Material Fact Concerning Whether Morgan Stanley Had a Duty to Keep Veleron's Information Confidential.**

A misappropriation claim arises when a defendant's use of confidential information breaches "a duty owed to the source of the [misappropriated] information" *O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199.[11] Morgan Stanley argues that it owed Veleron no such duty.

Veleron has presented enough evidence on this point to preclude Morgan Stanley from prevailing on its motion for summary judgment.

To support a claim of misappropriation under Section 10(b) and Rule 10(b)–5, a duty must be "a fiduciary duty or [rise from a] similar relationship of trust and confidence...." *United States v. Chestman,* 947 F.2d at 566. If the relationship between the parties is not legally fiduciary in nature, it can still support a claim of misappropriation, as long as it "share[s] the essential characteristics of a

**10.** To Morgan Stanley's argument that any general sense of unease that Morgan Stanley might have communicated to the market failed to reveal the specific material non-public information that was causing it to short the stock, I note that the case it cites as support—*In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 40 (2d Cir.2009)—is not a case about materiality, but about loss causation.

**11.** I refer to both civil and criminal cases because "criminal liability under SEC regulations for insider trading may not extend beyond the conduct that Congress intended to encompass in § 10(b) of the 1934 Act." *United States v. Vilar,* 729 F.3d 62, 76 (2d Cir.2013) (quoting *United States v. Gansman,* 657 F.3d 85, 90 n. 5 (2d Cir.2011)).

fiduciary association," such that it is "the functional equivalent of a fiduciary relationship." *Id.* at 568. A "10b duty" (whether legally fiduciary or functionally so) is characterized by "authority and dependency," *id.* at 569, in which "the party in whom confidence is reposed … acts to serve the interests of the party entrusting him or her with such information," *Falcone,* 257 F.3d at 234–35, and so thus endowed with both "discretionary authority and dependency." *Chestman,* 947 F.2d at 569. "Qualifying relationships are marked by the fact that *the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information,"* *Falcone,* 257 F.3d at 234–35 (emphasis added), and "there is resulting superiority and influence on the other [side]." *Chestman,* 947 F.2d at 568. At the relationship's heart there must be " 'reliance, and de facto control and dominance.' " *Id.* at 568 (*quoting United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982)).

In Rule 10b5–2, the S.E.C. has "provide[d] a *non-exclusive* set of examples in which a 'duty' arises for purposes of § 10(b) and Rule 10b–5." *Gansman,* 657 F.3d 85, 91 (2d Cir.2011) (citing 17 C.F.R. § 240.10b5–2 Preliminary Note; Insider Trading, U.S. Securities and Exchange Commission, http://www.sec.gov/answers/insider.htm ("[Rule 10b5–2] provides that a person receiving confidential information under circumstances specified in the rule would owe a duty of trust or confidence and thus could be liable under the misappropriation theory.")) (emphasis added); *accord S.E.C. v. Yun,* 327 F.3d 1263, 1273 n. 23 (11th Cir.2003).

Rule 10b5–2 provides: "a 'duty of trust or confidence' exists in the following circumstances, *among others:*

(1) Whenever a person agrees to maintain information in confidence;

(2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality; or

(3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

17 C.F.R. § 240.10b5–2. (Emphasis added).

There are three possible ways Morgan Stanley could have misappropriated information in this case. To survive Morgan Stanley's motion for summary judgment based on what I call "basic" misappropriation, Veleron must raise a factual question about whether Morgan Stanley owed a 10b duty directly to Veleron. Under its *Lyon/Talbot* analysis, Veleron must raise a question whether Morgan Stanley owed a 10b duty to BNP directly. Finally, under a "tipper-tippee" theory of misappropria-

tion, Veleron must raise a question whether Morgan Stanley owed a 10b duty to Veleron because it knew that BNP was required to keep the information it delivered to Morgan Stanley confidential, and was violating a duty by disclosing it.

I conclude that Veleron has raised a genuine issue of fact as to both "basic" and *Lyon/Talbot* misappropriation.

### 1. "Basic" Misappropriation

In the case in which the Supreme Court first articulated the misappropriation theory, it found that James O'Hagan, a partner at a law firm, could be liable to his law firm and to its client for using "for his own trading purposes material, nonpublic information regarding" the client. *O'Hagan*, 521 U.S. at 648, 117 S.Ct. 2199. O'Hagan had not worked for the client directly, but had acquired confidential information about the client by virtue of being as a partner at the firm. O'Hagan owed a duty of loyalty and confidence to his partners, obviously, but the Supreme Court held that he also owed a duty of loyalty and confidence to the firm's client—even though he did no work for the client—because the law firm to which O'Hagan owed a duty owed the client such a duty. This created an unbroken chain of duties. By trading on the client's information, O'Hagan "violate[d] Section 10(b) because the misappropriator engage[d] in deception by pretending 'loyalty to the principal while secretly converting the principal's information for personal gain.'" *United States v. Newman*, 773 F.3d 438, 446 (2d Cir.2014) (internal citations omitted).

Veleron argues that it is akin to the firm in *O'Hagan*, in that Morgan Stanley owed it a 10b duty not to trade while in possession of Veleron's confidential information. Veleron argues that that duty arose for three reasons:

1. Morgan Stanley was required to keep Veleron's information confidential by virtue of its receipt of the "investor pack;" and

2. Morgan Stanley was among Veleron's counterparties in the restructuring negotiations during the September 30–October 2 period and all counterparties bear each other 10b duties; and

3. Under Rule 10b5–2, the trade's practice with respect to both the restructuring negotiations and Morgan Stanley's status as disposal agent provided Veleron with a reasonable expectation that Morgan Stanley would keep Veleron's information confidential.

The first two arguments do not work. The third, however, might.

#### (a) The Investor Pack

Veleron first argues that Morgan Stanley expressly agreed to keep Veleron's information confidential by accepting the Investor Pack—the packet of information that BNP sent to potential syndicate members back in June 2007, when it was looking for partners to assume some of the risk associated with the loan. The terms of the Investor Pack required the recipient to keep confidential certain "Evaluation Material" concerning the "Transaction" pursuant to which Veleron would purchase its interest in Magna. The Evaluation Material consisted of the Investor Pack itself, and "any other information regarding Veleron ... or the Financing ... furnished or communicated to the Recipient by or on behalf of Veleron *in connection with the Transaction*." (Investor Pack at 2.) The Transaction, it will be recalled (*see supra.*, page 416), was the multi-faceted deal pursuant to which Veleron was to acquire its interest in Magna. (Investor Pack at 7).

By its terms, the duty of confidentiality imposed on recipients of the Investor Pack (1) extended only to information furnished in connection with the "Transaction" and (2) lasted only until the recipient of the Pack "becomes a party to the definitive agreements regarding the Financing." In other words, recipients of the Investor Pack did not assume a duty of confidentiality over any and all information relating to Veleron for all time, but only over the information conveyed to them via the Pack (the material they were asked to evaluate before deciding whether to become Participants in the syndicate) or communicated to them in connection with the Transaction described in the Pack—and then only until they actually signed on to the financing documents.

Given this, two flaws appear in Veleron's argument that the Investor Pack can be the basis of a 10b duty owed by Morgan Stanley directly to Veleron.

First, the information Veleron now assigns as confidential and non-public information was not part of the Evaluation Material, and could not have been part of the Evaluation Material. In June of 2007 Veleron's default, its liquidity problems and its desire to renegotiate the loan were all fifteen months in the future. By the time they transpired, the Transaction was long-completed.

Veleron argues that the Investor Pack's confidentiality provisions applied to any information Morgan Stanley had about Veleron, its parent companies, or the loan. That argument is unpersuasive. In the Investor Pack, the term "Transaction" is not defined as "the loan." Instead, the term "Financing," is used to describe "the 1.229 billion margin loan secured by 20 million class A Subordinated Voting Shares of Magna." (See, e.g., Investor Pack Executive Summary, Polkes Dec. Ex. 11 at MSVELERON 00000583; Pl. Counter 56.1 ¶ 38.) If the parties wanted confidentiality to extend to information "furnished or communicated ... in connection with the Financing," they could (and should) have said so. By limiting the confidentiality provision to information "furnished or communicated ... in connection with the Transaction," BNP made it quite clear that, once the Transaction took place, information about the loan itself was no longer subject to pre-Transaction confidentiality.

If confirmation that this is the only sensible reading of the provision were needed, it can be found in the fact that, as soon as Morgan Stanley signed the Credit Default Swap Agreement, the confidentiality terms of that Agreement overrode any confidentiality terms in the Investor Pack. As discussed above (see supra., p. 417), per the Swap Agreement, Morgan Stanley assumed no independent duty of confidentiality with respect to any information it received in connection with the Swap. This does not preclude Morgan Stanley's having some other duty to keep information confidential. But it does mean that Morgan Stanley's participation in the Swap, in and of itself, did not impose such a duty—and in fact obliterated any pre-existing duty arising out of receipt of the Investor Pack. Because it executed the Credit Default Swap Agreement, Morgan Stanley, *wearing its hat as a hedging bank*, was bound only by whatever duty of confidentiality was imposed by the Swap Agreement—which was none.

Thus, Morgan Stanley did not owe Veleron a 10b duty by virtue of the Investor Pack.

### (b) The Restructuring Negotiations

Second, Veleron argues that Morgan Stanley owed it a 10b duty directly because Morgan Stanley, at BNP's behest, participated in the abortive negotiations

about restructuring the loan. That argument does not work, either.

▮▮▮▮ We start from the proposition that sitting down at the negotiating table does not, in itself, give rise to any fiduciary or quasi-fiduciary duty. "[W]hen parties deal at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid–Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir.2002) (quoting *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994)). *See also Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 14 (2d Cir.1983) (affirming lower court's conclusion "that unless plaintiffs can set forth facts that turn the negotiations from arm's length bargaining into a fiduciary relationship, they cannot claim that Morgan Stanley owed them a fiduciary duty.") As long ago as 1975, the Second Circuit held that investment companies that traded on confidential information obtained in the course of negotiations for private placement of debentures owed no duty to the selling corporation. *Frigitemp Corp. v. Fin. Dynamics Fund, Inc.*, 524 F.2d 275, 278–79 (2d Cir.1975). Of course, where negotiating parties sign confidentiality agreements, they may impose such a duty on themselves, *see. Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 162, 171–72 (2d Cir.1999), but no such agreement was signed during the frenzied three day period when the instant negotiations took place.

To raise a factual question as to the existence of the "extraordinary circum-. stances" that could give rise to a 10b duty between counterparties in a negotiation, *In re Mid–Island Hosp., Inc.*, 276 F.3d at 130, Veleron would have to explain what communications it had with Morgan Stanley, "how the communication proceeded, what understandings were reached, [and/or] what assumptions or expectations the trade's practice would justify." *Moss*, 719 F.2d at 14 (quoting *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 798 (2d Cir. 1980)). But in the first instance, Veleron asserts that the very fact it was in negotiations gives rise to a 10b duty, which is incorrect as a matter of law.

Veleron also points to Morgan Stanley's internal policies and procedures as evidence that Morgan Stanley owed a 10b duty to Veleron. Morgan Stanley's "Global Policy on Confidential Information, Inside Information, and Information Barriers" provides that "any information disclosed to the Firm by a ... counterparty" is "confidential information ... unless it is clear that information is public o[r] an official source confirms the information is no longer confidential." (Veleron 56.1 ¶ 200.) But the Second Circuit has explained that Morgan Stanley's internal procedures—on their own—do not impose on it a duty greater than that imposed by law:

> As a policy matter, it makes no sense to discourage the adoption of higher standards than the law requires by treating them as predicates for liability. Courts therefore have sensibly declined to infer legal duties from internal 'house rules' or industry norms that advocate greater vigilance than otherwise required by law. *See, e.g., Farmland Indus. v. Frazier–Parrott Commodities, Inc.*, 871 F.2d 1402, 1407 (8th Cir.1989) ("[F]ailure to follow [internal policies and procedures] will not give rise to a cause of action in the absence of independent facts establishing fraud.") (citation omitted); *J.E. Hoetger & Co. v. Ascencio*, 572 F.Supp. 814, 822 (E.D.Mich.1983) (observing that to allow private cause of action based on firm's violation of internal rules "would impose the greatest

additional liability on those firms policing themselves rigorously ... effectively punishing the diligent and favoring the lax") ...

*de Kwiatkowski v. Bear, Stearns & Co.,* 306 F.3d 1293, 1311 (2d Cir.2002) (citations omitted). So unless Morgan Stanley communicated to Veleron that it was giving Plaintiff the benefit of its internal policies and procedures—and there is absolutely no evidence that it did—those procedures imposed on Morgan Stanley no legal duty to keep information learned during the negotiations confidential.

### (c) History, Pattern or Practice of Sharing Confidences

■ Finally, Veleron asks the Court to find a direct 10b duty based on Rule 10b5-2(b)(2), which recognizes the existence of such a duty:

Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality.

Veleron asserts that a confluence of six factors evidence that it and Morgan Stanley had a "history, pattern or practice of sharing confidences," thereby imposing on Morgan Stanley a direct duty of confidentiality with respect to information obtained from Veleron during the restructuring negotiations: (1) it "had a pre-existing relationship" with Morgan Stanley; (2) even though Morgan Stanley was not a party to the Credit Agreement, that document's confidentiality provisions gave Veleron "a baseline expectation that any information in relation to the Credit Agreement would

be kept confidential" (Veleron Br. at 42–43); (3) the confidentiality provision in the Investor Pack gave rise to a similar expectation; (4) industry practice gave rise to such an expectation; (5) statements by Morgan Stanley's Kevin Woodruff, who articulated need for everyone involved in restructuring negotiations to keep quiet about them, and who promised to try to get Magna to hold off on issuing a public statement; and (6) Morgan Stanley's role as the disposal agent charged with selling off the collateral for the loan gave Veleron an expectation that—consistent with industry practice—Morgan Stanley would not do anything to depress the value of the shares it shortly would be required to sell.

Some of these factors can be dispensed with summarily.

First, Morgan Stanley was not party to the Credit Agreement, so nothing in that contract evidenced "a history, pattern, or practice of sharing confidences" between Veleron *and Morgan Stanley.*[12] The terms of the Agreement did indeed give rise to a "baseline expectation" of confidentiality, as Veleron puts it; BNP, which was a party to the Agreement, was supposed to obtain an NDA commitment from anyone to whom it was privileged to disclose information (which included Morgan Stanley). However, in this instance BNP breached its contractual obligation to Veleron and did not obtain such a written commitment from Morgan Stanley.

Second, as already explained, the Investor Pack's confidentiality provisions did not extend to communications made fifteen months after the Transaction closed, and had lapsed by their terms once the Swap agreement was signed, sealed and delivered. Furthermore, the Investor Pack did not come from Veleron and was not distributed for Veleron's benefit; it was as-

---

**12.** For the relevance of the Credit Agreement to any indirect duty via BNP, see infra. at. ? ?)

sembled and distributed by BNP in an effort by BNP to mitigate its own risk in connection with the Veleron loan. Nothing in that document evidences anything about Veleron's sharing confidences with Morgan Stanley.

Third, there was some sort of pre-existing business relationship between Morgan Stanley and Oleg Deripaska—Veleron's ultimate beneficial owner (Pl. 56.1 ¶¶ 25–28)—and it was a very important relationship to certain people at Morgan Stanley. On October 2, 2008, while the restructuring negotiations were ongoing and before the collateral was sold, Elena Titova, an employee in Morgan Stanley's Investment Banking Division, wrote to her colleagues that she was

> Concerned if we decline any restructuring proposal without even defining terms that may work for us. Basic Element/Deripaska is a relationship in which many people internally invested. [sic] The principal is in contact with JJM [i.e., John J. Mack, Morgan Stanley's Chief Executive] directly ... This will erase the investment we made into this account—one of the largest in our region.

(Cooper Aff. Ex. 38 at MS—VELERON 00000552.); see also Cooper Aff. Ex. 40 (e-mail of October 1, 2008 from MS employee Rachel Lord to, inter alia, Kevin Woodruff, stating "This is a client we need to do business with going forward per Rair.") Franck Petitgas, the Global Co–Head of Morgan Stanley's Investment Banking Division, forwarded Titova's e-mail to others, echoing her concern "that we will damage the pay to play/relationship [sic] investment with deripaska ... this is a v difficult but v impt client ... the irony is that we got nil relationship value for coming in this margin loan under bnpp, and now we face only downside." (Id. at MS—VELERON 00000551.) Indeed, when those individuals met with Deripaska after October 3, they apologized to Deripaska for Morgan Stanley's "betrayal"—which Deripaska himself found surprising. (Id. at 83–84.)

But nothing in the record evidences any sort of pre-existing relationship of trust and confidence between Morgan Stanley and Deripaska. In fact, the record is barren of any evidence that would explain what sort of relationship the bank had with Deripaska and his entities. I have no idea what the "pay to play/relationship investment with deripaska" refers to; it might have been nothing more than the cultivation of a potential client, in the hope of doing business together some day. There is no indication that Deripaska ever retained Morgan Stanley on any deal or confided anything to the bank in confidence; Deripaska plainly viewed Morgan Stanley as just one more bank competing for his business. (Id. at 33–34.) He certainly did not seem to feel that that Morgan Stanley had misbehaved during the Magna meltdown:

> Banks wants to make money, you know, out of any, you know, business they have with their client ... When [Morgan Stanley employees] came [to talk about the Magna deal], they came in same number like you [Morgan Stanley's counsel at Deripaska's deposition]. You have five, six people on a desk. They put your business card. You just recognize them maybe next time if they're not fired yet from the bank for different circumstances. *And we talk generally about business.*

(Cooper Aff. Ex. 1 at 30–32 (emphasis added).)

The remaining factors—Woodruff's comments and Veleron's evidence of industry practice with respect to both negotiations and disposal agents—require more discussion.

Morgan Stanley does not address Woodruff's call for secrecy in its brief, and his comments bear troubling implications, which will be discussed more fully in a different context. The issue here, though, is whether the parties had a history, pattern or practice of exchanging confidences. Woodruff s statements were made during the restructuring negotiations and their beginning is telling: *"Obviously,"* Woodruff said, "the critical thing for everybody on this call is not to leak this out to either people on your trading floors or to potential investors ahead of time because then the stock will probably take a nosedive very quickly. So the biggest precaution that we can all take is to keep this highly confidential." (Pl. 56.1 ¶ 164) (emphasis added). His call for secrecy is consistent with Morgan Stanley's own internal policies on confidentiality, and provides support for the reasonableness of Veleron's belief that the information it was communicating in the context of restructuring discussions was being kept confidential. Everyone participating in those discussions had an interest in keeping the price of Magna stock high, because everyone was hedging BNP's risk. It was "obvious" that that information needed to be kept confidential. And the reason it was "obvious" had to do with the impact that a leak would have on the price of Magna stock.

Woodruff's statement is consistent with Veleron's claim that industry practice justified its expectation Morgan Stanley would treat as confidential information obtained from a counterparty during negotiations. Veleron asserts that that Morgan Stanley's internal policies and procedures (as quoted above) were "consistent with those generally found in the industry"— meaning that the financial services industry followed practices that would have justified Veleron's expectation that Morgan Stanley would keep its information confidential. (Veleron Br. at 42; Pl. 56.1

¶¶ 221–22.) Veleron also asserts that, separate from Morgan Stanley's status as a counterparty in negotiations, the entire industry had a practice of expecting disposal agents to refrain from activities that would depress the price of the stock they were retained to sell—including activities that communicated negative information to the market.

Veleron supports its two-headed argument regarding trade practice with evidence from two witnesses.

The first is Michel Mirochnikoff, who worked at Morgan Stanley in an unspecified capacity. Mr. Mirochnikoff was not offered as an expert on industry practice, and was clear from his testimony that he was not one. Mirochnikoff received training on Morgan Stanley's confidentiality policies, and had also received similar training on what constitutes confidential information during a previous period of employment at nonparty Credit Suisse. That was the limit of his knowledge. Mirochnikoff was not asked specifically whether there was a standard industry practice concerning the confidentiality of information received from a counterparty during negotiations, and also was not asked whether there was a standard industry expectation of disposal agents. When asked what definition of "material nonpublic information" was "standard in the industry," he answered "I don't know." (Cooper Dec. Ex. 110 at 27–29.) Mirochnikoff's testimony, limited as it was to the practices at the two institutions at which he worked, does not itself raise a genuine issue of fact concerning industry practice—on either the counterparty issue or the disposal agent issue.

But Veleron also offers the testimony of Robert M. MacLaverty, a Director with Berkeley Research Group, LLC. Beginning in 1992 and ending in 2009, MacLav-

erty worked with five major financial firms: J.P. Morgan & Co., Credit Suisse, Bank of America, Bear Stearns, and Morgan Stanley. (Cooper Dec. Ex. 138 at 9 n. 28.) Since that time he has done litigation consulting. (Docket #248–1 at 15–16; MacLaverty Dep. at 42–50.) Based on his "twenty years of experience trading and advising on securities and derivatives," MacLaverty testified that there was a

> general understanding and practice within the industry that one should not disclose (and must keep confidential) information that is learned in the course of doing business but is not available to the public. Further, based on industry standards, when an entity is charged with disposing of a large number of shares in a block trade, in advance of the disposal, it is required to keep confidential any information that might negatively affect the value of those shares.

(*Id.* at ¶¶ 2, 38, 40.)

Veleron tenders MacLaverty as an expert on industry norms, and given his extensive industry experience, this Court is inclined to qualify him as one. His testimony—especially when taken together with Morgan Stanley's own internal policies and the statements and actions of its Managing Director Woodruff in the context of this case—raises a genuine issue about whether Morgan Stanley had a direct 10(b) duty to Veleron pursuant to the criteria of Rule 10b–5(2).

The question confronting this Court is whether MacLaverty is qualified to offer these two opinions. Morgan Stanley moves to strike MacLaverty's testimony, largely on the ground that my colleague, Judge Rakoff, in an unpublished oral opinion, declined to accept him as an expert on a different subject in a different case.

I am unpersuaded; Morgan Stanley's motion to strike MacLaverty's testimony is denied.

 Generally speaking, Federal Rule of Evidence 702 encourages "a liberal approach to expert witness qualification." Wright & Miller, Fed. Prac. & Proc. Evid. § 6265 (1st ed.) Of course, "the consequence of this liberality is not, or at least should not be, a free-for-all." *Wilson v. City of Chicago,* 6 F.3d 1233, 1238 (7th Cir.1993) (Posner, J.). Instead, the Rule "imposes a special obligation upon a trial judge to 'ensure that any and all ... [expert] testimony ... is not only relevant, but reliable.' ... this basic gatekeeping obligation applies ... to all expert testimony." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Trial courts have significant discretion in deciding how to discharge that gatekeeping obligation, enjoying "broad latitude when ... decid[ing] *how* to determine reliability." *Id.* at 142, 119 S.Ct. 1167 (citing *General Electric Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

Veleron proffers MacLaverty as an expert based on his long experience in the financial services industry. There is nothing wrong with this: the very text of Fed. R. Evid. 702 provides that an expert can be qualified on the basis of his "knowledge, skill, *experience,* training, or education ..." MacLaverty's experience on Wall Street during a twenty-year career as a salesman and trader gives him impressive experiential credentials. I accept that MacLaverty likely acquired considerable familiarity with how Wall Streeters do business and could be expected to testify about certain matters based on that familiarity.

 Of course, courts do not simply take the word of people with experience; the court's gatekeeping function applies even to experts whose opinion testimony

derives from their experience. Even though, "There is no clear application of the *Daubert* factors ... where [the] expert[ ] relied primarily, if not solely, on [his] experience in forming [his] ... opinions." *Emig v. Electrolux Home Products Inc.*, No. 06–CV–4791, 2008 WL 4200988, at *7 (S.D.N.Y. Sept. 11, 2008) (citing *Liriano v. Hobart Corp.*, 949 F.Supp. 171, 177 (S.D.N.Y.1996)), Rule 702 still "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 149, 119 S.Ct. 1167. Thus, "a proffered expert who relied solely on his or her experience in arriving at his or her expert opinion must have based that opinion on sufficient facts or data," and " 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts,'." *Id.* (quoting *Bah v. Nordson Corp.*, No. 00 Civ. 9060, 2005 WL 1813023, at *9 (S.D.N.Y. Aug. 1, 2005) (quoting Fed.R.Evid. 702 advisory committee's note)). "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146, 118 S.Ct. 512.

█ Further, where a witness opines about standards in a given industry, "such an expert must show how his or her experience [in the industry] ... led to his conclusion or provided a basis for his opinion." *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 132 (2d Cir.2006) (internal citations and quotation marks omitted).

Insofar as MacLaverty opines about industry standards on information obtained in the course of doing business and the duties of a disposal agent, Morgan Stanley argues that MacLaverty's testimony is unreliable for the following reasons:

■ MacLaverty did not review the policies or procedures of any bank other than Morgan Stanley before offering his conclusion that other banks follow the same practices and procedures regarding confidentiality that Morgan Stanley does. Docket # 248–2 at 86.

■ MacLaverty did not conduct a survey to probe industry customs. *Id.*

■ MacLaverty is not a lawyer and has never worked in a compliance department. *Id.* at 72. As part of his job he was not consulted about confidentiality; such questions were generally directed to the legal and compliance departments. *Id.* at 77. Instead, if there were a question about confidentiality, he was always encouraged to consult the legal or compliance departments. *Id.*

■ MacLaverty has never taught a class on these matters or written on them. *Id.* at 88.

■ MacLaverty had no idea whether the training he had received on confidentiality issues at the various banks at which he worked was identical to the training or "knowledge" that others in the industry received: (*Id.* at 63.)

I only know what I received. I wouldn't know whether it was any different than anybody else because I don't know what other people got or what other people did ... I do know [what] ... I had to do. But I can't speak to whether that's more or less than any other person in other departments or other firms ... I don't know what the standard was for everybody. I can only—because I know for a fact not everybody went through the training program at JPMorgan. So maybe we did get things that others inside the firm didn't get. And at differ-

ent points in time with different firms, some people get hired as lateral hires for management positions that may or may not have had the same training and education regarding [confidentiality] issues that I might have had. So I can't speak to what they had with certainty ... I can only ... speak to my understanding that they would have been held to the same standard of care that I was, whether they were given special training or not.

*Id.* at 68.

■ MacLaverty's "methodology" for reaching his opinion about industry standards is suspect: he read only the documents that were provided by counsel and had "intermittent conversations ... of a fairly casual nature to sort of bounce ideas off of" a colleague at his current firm who had also worked at unspecified financial institutions at some unspecified time in the past, some of which institutions were the same as those at which MacLaverty himself had worked. *Id.* at 88–89. These conversations—there were three at most—were "in passing" and "might have been a matter of minutes." *Id.*

■ Some of Morgan Stanley's objections are pure pettifoggery. MacLaverty had worked in five of the preeminent firms in a highly competitive industry. He had become acquainted with each firm's code of conduct during his years of service. And he had executed twenty years' worth of trades in circumstances that required him to be familiar with how his firms treated nonpublic information—as well as

how his trading partners' institutions treated nonpublic information (*see* MacLaverty Dep. at 56–57, 76). So the fact that he did not conduct a "survey" before reaching his conclusion, or did not obtain a copy of every other bank's internal policies, is at best an avenue for cross-examination, rather than a disqualification from testifying. Similarly, the fact that he was not a lawyer, and would have consulted with a lawyer in situations where he had questions about confidentiality and compliance, does not diminish his knowledge of what bankers and traders understood their confidentiality obligations to be on a day-to-day basis. Insofar as he opines about industry practices concerning confidentiality, MacLaverty is not testifying to legal conclusions or as a legal expert.[13]

Finally, as to his lack of academic experience, I am constrained to quote the maxim, "Those who can, do; those who can't, teach." The word of an experienced trader about what traders are and are not allowed to do with information obtained during negotiations—especially if that information is market-moving, and the trader is also a disposal agent for the stock whose price is likely to move—is potentially worth far more than the opinion of any ivory tower academic.

Morgan Stanley's principal objection is to MacLaverty's methodology: his reliance on (1) his own experience, (2) the information that he was provided by counsel (which was apparently limited to information regarding Morgan Stanley), and (3) a few confirmatory conversations that he had with others at his current firm. Defendant argues this this is precisely the sort of methodology that caused Judge

---

13. Portions of MacLaverty's affidavit are in fact strikable because it consists of a lecture about what constitutes "confidential information." That is a legal matter, on which Mr. MacLaverty's opinion is neither necessary nor proper. However, to the extent that he testifies about whether the financial services industry expects that information obtained during the course of negotiations, or market-moving information, is to be treated as confidential, MacLaverty is testifying about matters very much within his ken.

Rakoff to reject him as an expert in the matter of *S.E.C. v. Stoker*, 11 Civ. 07388.

In *Stoker*, the issue was whether a certain financial product was "distinctive." At a July 2012 conference in that matter, Judge Rakoff excluded MacLaverty's opinion on the issue of "distinctiveness" because MacLaverty admitted that there was no general understanding of what was distinctive versus what was standard and his opinion was:

> based on his observations of other CDOs that he personally knows of, and, quote, casual conversations with, quote, guys that I either live near or kids go to school together. That sounds like a pretty dubious methodology ...

(Docket # 248–4 at 74.)

The first reason why Judge Rakoff's ruling in *Stoker* is of little relevance here is that there is a huge difference between MacLaverty's testimony in that case and in this one. In that case MacLaverty admitted that *there was no general industry understanding* of what was distinctive and what was not—an understandable admissions, as the concept of "distinctiveness" is not part of the common parlance of the financial services industry. So in opining on the meaning of "distinctiveness," MacLaverty was simply offering his own opinion, not the industry's. In this case, by contrast, MacLaverty squarely opines that, in day-to-day dealings at Wall Street firms, (1) information received during the course of business negotiations is to be kept confidential, by custom in the industry; and (2) market-moving information that would depress the price of a security must be kept confidential by an entity that is charged with disposing of a large bloc of that security. I would not allow a purported "expert" to offer an opinion about something if he testified under oath that there was no industry-wide understanding,

either. But that is not the case confronting me.

Ultimately, Morgan Stanley's argument is that Mr. MacLaverty should not be permitted to testify as an expert because he has no "special" expertise regarding confidentiality. But that is precisely what qualifies him to offer an opinion on industry-wide practices. To the extent that he is being offered to opine about what *everyone* in his industry was expected to keep confidential, it is his deep and broad familiarity with the quotidian that makes him potentially useful to a juror. As he testified at his deposition: "Q. What you were required to sign and what you were required to know is no different from what any other vice president or associate ... was required to sign or know, correct? A ... That's been my understanding." (MacLaverty Dep. at 62.) If what he knew is no different from what everyone else knew, then he is just the man to ask about what practices were common within the industry. Morgan Stanley's policies were, in MacLaverty's recollection, "consistent with policies and procedures of prior firms with which I worked," (*id.* at 144–45)–all of which he had seen when he worked at those institutions. And his opinion that Morgan Stanley had some obligation to keep information confidential is based on:

> the code of conduct, among other things, within each of the firms with whom I worked, within the general understanding of all colleagues—all colleagues that I've ever worked with in the securities industry at all of the firms that I recall working with having to operate, and for a general understanding of being able to do business while maintaining the integrity of the marketplace.

(MacLaverty Dep. at 125.) He claimed to have familiarity with these matters. I would be shocked if he did not.

Because Mr. MacLaverty's opinion regarding industry standards is based on his recollection of what was common in the industry over the course of two decades, that opinion is based on "sufficient facts or data" for purposes of opining about what was in fact standard in the industry. *Emig,* 2008 WL 4200988 at *7. The fact that MacLaverty's testimony regarding trade practice appears to be corroborated both by Morgan Stanley's own internal policies and by the statements and actions of its Managing Director Woodruff in the context of this case makes this court much more comfortable admitting his testimony.

In short, MacLaverty's testimony—this particular bit of it, anyway—should not be stricken. Taken together with Woodruff's comments, it raises a genuine issue of material fact as to whether Morgan Stanley owed Veleron a 10b duty because its position vis-à-vis Veleron gave Veleron an expectation of confidentiality that "the trade's practice would justify." *Moss,* 719 F.2d at 14 (quoting *Walton v. Morgan Stanley & Co.,* 623 F.2d 796, 798 (2d Cir. 1980)). This supports a "basic misappropriation" theory of insider trading liability under Rule 10b5–2.

### 2. Veleron Has Raised a Genuine Issue of Material Fact Under the The *Lyon/Talbot* Theory of Misappropriation

Veleron proffers a second, alternative analysis of misappropriation—the *Lyon/Talbot* analysis—which provides an alternative basis on which Veleron may argue to a jury that Morgan Stanley owed a "duty" sufficient to support Veleron's misappropriation claim.

14. I consider both criminal and civil cases here because "criminal liability under SEC regulations for insider trading may not extend beyond the conduct that Congress intended to encompass in § 10(b) of the 1934 Act." *United*

▇ A misappropriation claim depends on the defendant's breach of "a duty owed to the source of the [misappropriated] information." *O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199.[14] The "source" to which a duty is owed need not be the "originating" source of the information. Misappropriation liability also attaches where the defendant owes a duty of trust and confidentiality to an intermediary who was his source. *S.E.C. v. Lyon,* 605 F.Supp.2d 531, 546 (S.D.N.Y.2009) (citing *S.E.C. v. Talbot,* 530 F.3d 1085, 1093–95 (9th Cir.2008) (in turn citing *United States v. Carpenter,* 791 F.2d 1024, 1026 (2d Cir.1986))).

This interpretation of *O'Hagan's* "source" requirement relies on *O'Hagan* itself. The *O'Hagan* court found that, even though there was a continuous chain of duties as between O'Hagan, his firm, and its client, it was sufficient that O'Hagan owed a duty of trust and confidentiality to his firm. Of course, his firm was not the "originating source" of the client information on which O'Hagan traded; the client was. *See Talbot,* 530 F.3d at 1093 (citing *O'Hagan,* 521 U.S. at 655 nn. 6–7, 117 S.Ct. 2199). Yet O'Hagan's duty to the firm alone sufficed to give rise to a duty to the client—an indirect duty, as it were—to keep the information confidential. *Id.*

*Talbot* and *Lyon* recognize that, so long as one owes a duty of trust and confidence to the immediate source of confidential information, even though the information be about some third party, that duty satisfies *O'Hagan's* requirement that a duty be owed to the "source of the information." *States v. Vilar,* 729 F.3d 62, 76 (2d Cir.2013) *cert. denied,* ── U.S. ──, 134 S.Ct. 2684, 189 L.Ed.2d 230 (2014) (quoting *Gansman,* 657 F.3d at 90 n. 5).

Before discovery, I surmised that the *Lyon/Talbot* analysis in this case arose because BNP—which had an express duty "to keep confidential *any information obtained in relation to the [Credit] Agreement* ..." (Cooper Dec. Ex. 7 § 14.12.) (Emphasis added)—was supposed to obtain a written confidentiality agreement from Morgan Stanley before making disclosures "necessary for discharging its responsibilities under the Agreement." (*Id.* § 14.12(a), (c) (emphasis added).) In the decision on Morgan Stanley's motion to dismiss, I explained my surmise:

> To the extent this case presents an intermediary-as-source scenario, as in *S.E.C. v. Lyon*, 605 F.Supp.2d 531 (S.D.N.Y.2009), BNP was the intermediary between Morgan Stanley and Veleron, not Magna (Magna is irrelevant, except that it is Magna's stock that is at issue). BNP had a duty to Veleron; if BNP did what it was supposed to do and got Morgan Stanley to sign a confidentiality agreement, then Morgan Stanley had a duty to BNP (and incidentally to Veleron). On this basis, *Lyon* applies and Veleron has adequately pleaded the required duty of confidentiality and breach thereof.

Decision and Order at 33.

As it turns out, BNP did *not* do what it was supposed to do; there is no evidence that Morgan Stanley signed such an agreement, or for that matter was ever asked to do so. Nonetheless, Veleron has two different arguments for why the *Talbot/Lyon* analysis still applies:

First, it asserts that Morgan Stanley owed a duty of trust and confidence to BNP by virtue of its agreement to act as BNP's agent in disposing of the Pledged Collateral.

Second, it argues that Morgan Stanley trader Kerim Tuna (who carried out the alleged insider trading), breached his duty to Morgan Stanley, his employer, for which Morgan Stanley may be held liable in *respondeat superior*.

I need only address the first contention, because it suffices to keep Veleron's insider trading claim alive.[15] Veleron has raised a genuine issue of material fact in support of this theory.

But before I discuss that issue, I must deal with a preliminary argument: Morgan Stanley insists that Veleron has no standing to assert a *Lyon/Talbot* misappropriation claim.

### (a) Veleron Has a Private Right of Action Section 10(b) and Rule 10(b)–5, Whatever the Theory

■ Morgan Stanley objects that no private right of action exists to permit Veleron to "enforce" any duty it might owe Morgan Stanley under *Lyon/Talbot* misappropriation analysis.[16] The argument fails, because the private right of action under Section 10b is granted to those with particular harms, not those who pursue particular theories.

"The language of Section 10(b) and Rule 10b–5 does not explicitly create a private right of action." *Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 30–31

---

**15.** Veleron's *respondeat superior* theory is not pleaded in the First Amended Complaint. That document alleges breaches of duties allegedly owed by Morgan Stanley—not any duty owed *to* Morgan Stanley. As Veleron "did not plead this theory of fraud with particularity in its complaint, the court will not consider it in resolving this motion" for summary judgment on the securities fraud claim. *Lyon*, 605 F.Supp.2d at 550 (S.D.N.Y.2009) (citing Fed.R.Civ.P. 9(b)).

**16.** Of course, this objection does not affect Veleron's ability to pursue what I have called a "basic" misappropriation theory.

(2d Cir.2004). Instead, beginning in 1946, the federal courts looked to § 10(b) and its implementing regulation and found an implied private right of action, *Kardon v. National Gypsum Co.*, 69 F.Supp. 512, 514 (E.D.Pa.1946), which "resemble[s] in many (but not all) respects common-law deceit and misrepresentation actions." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). "When we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *see also* L. Loss & J. Seligman, Fundamentals of Securities Regulation 910–918 (5th ed.2004) (describing relationship to common-law deceit).

"However, the private right of action is not unlimited." *Ontario Pub. Serv. Employees Union Pension Trust Fund*, 369 F.3d at 30–31. Since *Blue Chip Stamps*, "the right to bring suit under § 10(b) of the Act [has been] limited to actual stock buyers and sellers because of the risk of nuisance litigation, in which would-be sellers and buyers would manufacture claims of hypothetical action, unconstrained by independent evidence." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091–92, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).

It is not disputed that Veleron was an "actual buyer or seller" of Magna stock during the relevant period. The Second Circuit has recognized that "defaulting pledgors ... with only a partial right to the proceeds of the sale of their stock, [have standing] to sue as 'sellers' under Rule 10b–5 when their stock is sold to pay off the loan against which the stock was pledged." *Madison Consultants v. Fed. Deposit Ins. Corp.*, 710 F.2d 57, 61 (2d Cir.1983); *see also Dopp v. Franklin Nat.*

*Bank*, 374 F.Supp. 904, 909 (S.D.N.Y. 1974). Thus, Veleron falls comfortably within the "purchaser-seller" requirement of Rule 10(b).

 However, Morgan Stanley objects that permitting a plaintiff like Veleron to pursue a *Lyon/Talbot* theory would violate the hornbook law that one generally may not sue to enforce the right of another—in this case, the right of BNP.

This seems to be a question of first impression. It is not, however, a particularly difficult question to answer.

 The Court is "mindful that it must give 'narrow dimensions ... to a right ... Congress did not authorize when it first enacted the statute and did not expand when it revisited' it" in the Private Securities Litigation Reform Act of 1995. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 131 S.Ct. 2296, 2298, 180 L.Ed.2d 166 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 167, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)).

 However, the Supreme Court recently affirmed that whether a private plaintiff has a cause of action under a statute is a function of whether it falls into the "zone of interest" contemplated by that statute—which question should be answered using traditional tools of statutory interpretation. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ___ U.S. ___, 134 S.Ct. 1377, 1387, 188 L.Ed.2d 392 (2014).

There can be little doubt that Veleron falls into § 10b's zone of interest as the courts have defined it over the last 80 years. "Section 10(b), this Court has implied from the statute's text and purpose, affords a right of action to purchasers or sellers of securities injured by its violation." *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.,* 551 U.S. 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

> Those purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to "regulate," *see Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); it is parties or prospective parties to those transactions that the statute seeks to "protec[t]," *id.,* at 10, 92 S.Ct. 165. *See* also *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

*Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 267, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) (internal citations omitted). There is no question that Veleron is a forced seller, and that BNP, not Veleron, would receive the fruits of the transaction. And there is no question that Morgan Stanley's duty to Veleron, under *Lyon/Talbot,* derives from its duty to someone else—BNP.

There is also no question that Veleron, in its capacity as a seller of securities, was independently injured by Morgan Stanley's alleged breach of that duty (which duty, as will be discussed below, ran to it, albeit indirectly). As discussed extensively above, Veleron was and is legally responsible for the deficiency that remained after the forced sale. It has offered evidence tending to show that the deficiency was the greater than it otherwise would have been because, in the days immediately preceding the forced sale, Morgan Stanley—to cover its own potential losses-traded on information that it was required to keep confidential. For the same reason that Veleron has *constitutional* standing in this case, Veleron has *statutory* standing; it has a protectable interest that was allegedly injured by Morgan Stanley's favoring

its own interests over those of BNP—and derivatively, of Veleron.

 Morgan Stanley is of course correct that there is a "general prohibition on a litigant's raising another person's legal rights." *Lexmark,* 134 S.Ct. at 1387. But Veleron is not suing to "enforce" BNP's rights, as the principal under the ADA (although if Morgan Stanley is liable, then BNP suffered injury to the same extent and in the same amount as Veleron). Rather, Veleron, as a seller of securities, seeks to vindicate its own property right in *its* confidential information, which was allegedly exploited by a party who was under a duty not to use that information for its own purposes. "Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy." *Carpenter v. United States,* 484 U.S. 19, 26, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (quoting 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1, p. 260 (rev. ed.1986)). The entire history of misappropriation as a violation of § 10b is premised on that right: "A company's confidential information qualifies as property to which the company has a right of exclusive use; the undisclosed misappropriation of such information constitutes fraud akin to embezzlement." *O'Hagan,* 521 U.S. at 643, 117 S.Ct. 2199. Veleron claims that it—not BNP, but Veleron—was injured because Morgan Stanley misappropriated its confidential information and traded on that information in violation of § 10(b). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. at 318, 127 S.Ct. 2499. There is absolutely no reason to conclude that Veleron does not have a private right of action simply be-

cause the duty on which it relies ran first to BNP and only derivatively to it.

In short, the fact that Veleron is pursuing a *Lyon/Talbot* theory of liability has nothing to do with whether it has a private right of action under Section 10(b) and Rule 10b–5. Whether a private right of action exists is not a function of the method by which the alleged fraud was perpetrated, but whether the plaintiff has an interest that the law and the rule were intended to protect.

With that out of the way, we turn to the merits of the *Lyon/Talbot* argument.

### (b) Veleron Raises a Genuine Issue of Fact Under Lyon/Talbot.

 Veleron argues that a fiduciary duty—a 10b duty—arose from Morgan Stanley's status as BNP's agent under the Agency Disposal Agreement ("ADA"). The Second Circuit has recognized that the association between a principal and agent has characteristics that are "inherently fiduciary" and therefore within the realm of 10b duties. *Chestman,* 947 F.2d at 568 (emphasis added)

Morgan Stanley insists that it cannot be held liable under *Lyon/Talbot* reasoning because the ADA—notwithstanding its title and its designation of Morgan Stanley as BNP's Disposal *Agent*—specifically provides that Morgan Stanley "is acting as an independent contractor and not as a fiduciary ... or in any other position of higher trust." (ADA, Polkes Dec. Ex. 14 § 2).

 "The existence of an agency relationship is a mixed question of law and fact that should generally be decided by a jury." *Samba Enterprises, LLC v. iMesh, Inc.,* No. 06 Civ. 7660(DC), 2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009) *aff'd sub nom. Samba Enterprises, Ltd. v. iMesh, Inc.,* 390 Fed.Appx. 55 (2d Cir.2010) (citing *Cabrera v. Jakabovitz,* 24 F.3d 372, 385–86 (2d Cir.1994)). Only if "the facts

are insufficient to support a finding of agency or the facts are not in dispute, [can] the question of agency can be resolved as a matter of law." *Id.* So too, the question whether "[a] fiduciary relationship [exists] is necessarily fact-specific" *Oddo Asset Mgmt. v. Barclays Bank PLC,* 19 N.Y.3d 584, 950 N.Y.S.2d 325, 973 N.E.2d 735, 740–41 (2012) (internal citations and quotations omitted).

 The ADA is governed by New York law. ADA § 13. One does not become an "agent" under New York law, simply because that term is used in the title of a contract. *In re Shulman Transp. Enterprises, Inc.,* 744 F.2d 293, 295 (2d Cir.1984) (affirming district court's refusal to find agency relationship despite "agency" contract). Thus, while the Agency Disposal Agreement's use the word "agency" in its title is not a factor to be ignored, it is not dispositive.

 But neither can one avoid a duty's being deemed fiduciary in nature by the simple expedient of refusing to call it by its proper name. "[T]he relationship between contracting parties must be determined by its real character rather than by the form and color that the parties have given it." *Id.* (citing *Quackenbos v. Sayer,* 62 N.Y. 344, 346 (1875)). It is, therefore, of little consequence that the ADA declares Morgan Stanley to be "acting as an independent contractor." ADA § 2; *In re Shulman Transp. Enterprises, Inc.,* 744 F.2d at 295 ("An employee does not become an independent contractor simply because a contract describes him as such.... A debtor does not become the agent of his creditor simply because he is called an agent.") (citations and quotations omitted).

 It is true that, "Under New York law, contractual disclaimers of fiduciary duty are enforceable when sufficiently explicit." *Valentini v. Citigroup, Inc.,* 837

F.Supp.2d 304, 326 (S.D.N.Y.2011) (collecting cases). Thus, a long line of cases holds that, where contracting parties sufficiently disclaim a fiduciary relationship, none exists. *Summit Properties Int'l, LLC v. Ladies Prof'l Golf Ass'n,* No. 07 CIV. 10407(LBS), 2010 WL 2382405, at *7 (S.D.N.Y. June 14, 2010) (collecting cases).

 However, where a writing erects the essential structure of an agency relationship, even an explicit disclaimer cannot undo it. As New York's highest court recognized:

> Generally, where parties have entered into a contract, courts look to that agreement 'to discover ... the nexus of the parties' relationship and the particular contractual expression establishing the parties' interdependency. If the parties ... do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them ... *However, it is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.*

*EBC I, Inc. v. Goldman, Sachs & Co.,* 5 N.Y.3d 11, 20, 799 N.Y.S.2d 170, 832 N.E.2d 26 (N.Y.2005) (emphasis added).

Then–District Judge Chin applied these principles in *Samba Enterprises, LLC v. iMesh, Inc.,* No. 06 Civ. 7660(DC), 2009 WL 705537, at *8 (S.D.N.Y. Mar. 19, 2009); *aff'd sub nom. Samba Enterprises, Ltd. v. iMesh, Inc.,* 390 Fed.Appx. 55 (2d Cir. 2010). Samba had been contracted to find a suitable partner with whom the company iMesh could bundle software. Samba made a successful referral—of a company called Zango—but also entered into a side agreement with Zango under which Samba received a fee for referring iMesh to Zango. Pointing to the side deal, iMesh refused to pay Samba commission, arguing that Samba had breached its duty of loyalty. Samba sought payment from iMesh despite the side deal, and pointed to the referral agreement between it and iMesh, which

> explicitly provides that it can only give rise to an independent contractor relationship, and that it is not intended to create a 'partnership, franchise, joint venture, *agency,* or employment relationship.' Indeed, the next sentence provides that "[n]either party may act in a manner which expresses or implies a relationship other than that of independent contractor, nor bind the other party."

*Id.* at *7 (internal citations omitted).

Judge Chin concluded that this disclaimer was not dispositive of the character of the parties' relationship, because

> the Agreement provides that, even if Samba negotiates a favorable deal with [a third party], it will be up to iMesh whether it wants to enter an agreement with Ask. Thus, Samba was always at iMesh's 'direction and control' ... 'an essential characteristic of an agency relationship.'

*Id.* at *7 (S.D.N.Y. Mar. 19, 2009) (citing *Sty–Lite Co. v. Eminent Sportswear Inc.,* No. 01 Civ. 3320(CBM), 2002 WL 15650, at *3, 2002 U.S. Dist. LEXIS 119, at *9–10 (S.D.N.Y. Jan. 4, 2002)). Judge Chin ultimately decided that the parties' explicit disclaimer of agency was "inconsistent with the overall purpose of the Agreement, which was to engage Samba to act on [the defendant's] behalf—as its agent." *Id.* at *8. Not only did he refuse to give effect to the disclaimer, he granted iMesh's motion for summary judgment, on the ground that an agency relationship that comprehended a fiduciary duty was inherent in the Samba—iMesh arrangement—which Samba

breached by entering into the side deal with Zango.

So we must look past the labels that BNP and Morgan Stanley placed on their relationship, and instead plumb the real character of the services that Morgan Stanley provided to BNP—because, "Ultimately, the dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature 'finder' or 'broker' or even 'agent,' but instead by the services agreed to under the contract between the parties." *Ne. Gen. Corp. v. Wellington Adver., Inc.*, 82 N.Y.2d 158, 163, 604 N.Y.S.2d 1, 624 N.E.2d 129 (N.Y.1993).

There is at least ambiguity—and therefore a triable issue of fact [17]—about whether Morgan Stanley and BNP entered into an agent-principal relationship. To the extent one party or the other might be entitled to summary judgment on this issue, it would certainly not be Morgan Stanley.

In the context of agency relationships, "New York law is clear that a fiduciary relationship exists from the assumption of control and responsibility ... and is founded upon trust reposed by one party in the integrity and fidelity of another." *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.*, 601 F.Supp. 770, 772 (S.D.N.Y.1985) (citing *Gordon v. Bialystoker Center & Bikur Cholim, Inc.*, 45 N.Y.2d 692, 412 N.Y.S.2d 593, 385 N.E.2d 285, 288 (1978), *Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900 (N.Y.App.Div. 2d Dep't 1976)). An agency relationship that creates a fiduciary duty rises "when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent."

*In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 290 (S.D.N.Y.2005) (collecting cases).

Evidence of a fiduciary relationship between agent and principal pervades the ADA, in which BNP "engage[d] Morgan Stanley to act as [its] agent in respect of the disposal of part or all of the Securities ... In respect of any specific Disposal." (ADA § 1.).

A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26, 31 (2005) (quoting Restatement [Second] of Torts § 874, Comment *a*). The ADA and the related Disposal Notice to which Morgan Stanley agreed on October 2 certainly required Morgan Stanley to "act for" BNP; it was to dispose of 20 million shares of Magna stock on BNP's behalf in the unfortunate context of a default on a multi-million dollar loan. BNP relied on Morgan Stanley's expertise in structuring, pricing and timing the sale. These are hallmarks of a fiduciary relationship.

"Morgan Stanley's engagement as [BNP's] agent w[as to] be on an exclusive basis." (ADA § 1.) "[A]n exclusive agency gives rise to a fiduciary duty between principal and agent under New York law." *Vill. on Canon v. Bankers Trust Co.*, 920 F.Supp. 520, 532 (S.D.N.Y.1996) (collecting cases).

"The element of control often is deemed the essential characteristic ..." of a principal-agent relationship. *In re Parmalat Sec. Litig.*, 375 F.Supp.2d at 290. In order for a fiduciary relationship to arise, "the

17. *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396–97 (2d Cir.2009) (the existence of ambiguity in a contract is a matter for the court to decide; where extrinsic evidence can shed light on the question the contract fails to answer, that is a matter for the jury to resolve unless extrinsic evidence construed in the light most favorable to the nonmoving party).

principal must maintain control over key aspects of the undertaking." *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.,* 347 F.3d 448, 462 (2d Cir.2003) (citing *In re Shulman Transp. Enterprises, Inc.,* 744 F.2d at 295 ("An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control.")); *Meese v. Miller,* 79 A.D.2d 237, 436 N.Y.S.2d 496, 499 (4th Dep't 1981) ("It is a relationship whereby 'one retains a degree of direction and control over another'.").

The key aspect of this particular undertaking was entirely within BNP's control. Morgan Stanley could only sell the stock after BNP declared the loan to be in default, gave Veleron the requisite notices, and affirmatively directed Morgan Stanley to dispose of the collateral. Morgan Stanley had no discretion to sell the Magna stock on its own initiative.

Furthermore, while Morgan Stanley was given discretion to decide how to sell the stock and at what price, it was contractually required to subordinate its strategy to BNP's obligations under its Pledge Agreement with Veleron. (*Id.* § 2.) Section 4.1(2) of the Pledge Agreement provided that BNP

> and any nominee on its behalf shall be bound to exercise in the holding of the Pledged Collateral the same degree of care as it would exercise with respect to similar property of its own of similar value held in the same place. Neither [BNP] . . . nor any nominee acting on its behalf . . . shall be liable for any action taken or omitted to be taken by it hereunder or in connection here with except for its own gross negligence or willful misconduct. [BNP] and each of its nominees are hereby released from all responsibilities for any depreciation in or loss of value of any part of the Pledged Collateral except for such depreciation

or loss of value that is the result of [BNP's] . . . or its nominee's gross negligence, willful misconduct or breach of this Pledge and Security Agreement or Applicable Law in the care and custody of Pledged Collateral in its possession or control.

(Cooper Ex. 8 § 4.1(2).)

In the ADA, Morgan Stanley agreed— "pursuant to Session [sic] 6 the Pledge Agreement," under which BNP was "entitled, in the event the security constituted therein becomes enforceable, to instruct its agent to dispose of part or all of Securities"—to become that agent. (Cooper Ex. 10, Whereas Clause B.) Moreover, in the ADA, Morgan Stanley affirmatively acknowledged that, under the Pledge Agreement, BNP had an obligation "to seek the best price available in the market," and agreed that it—Morgan Stanley—would use "all reasonable [efforts]" to enable BNP to comply with that obligation. (ADA § 2).

Thus, there can be no question that BNP retained "a degree of direction and control" over Morgan Stanley in connection with the disposal of the Magna shares. That is indicative of an agency—and hence, a fiduciary—relationship.

Under New York law, "the agency relationship is fiduciary in nature and imposes on an agent, among others, a duty of 'utmost good faith.'" *UBS AG, Stamford Branch v. HealthSouth Corp.,* 645 F.Supp.2d 135, 144 (S.D.N.Y.2008) (quoting *Elco Shoe Mfrs. v. Sisk,* 260 N.Y. 100, 183 N.E. 191, 192 (1932); citing *Lamdin v. Broadway Surface Adver. Corp.,* 272 N.Y. 133, 138, 5 N.E.2d 66, 67 (1936) (agent will be "held to *uberrima fides* in his dealings with his principal").). "That duty is violated where an agent acts adversely to his employer in any part of the transaction or omits to disclose any inter-

est which would naturally influence his conduct ..." *Id.* (collecting cases) (internal quotations omitted). "Such a transaction is voidable at the election of the principal." (*Id.*) (collecting cases).

In the ADA, Morgan Stanley acknowledged that it might indeed have conflicts of interest with the disposal, and "undert[ook] to notify [BNP] immediately of any such conflict, interest, relationship or arrangement." (ADA § 2.)

Finally, consistent with a classic principal-agent relationship—Restatement (Second) of Agency § 438 (1958)—BNP agreed to indemnify Morgan Stanley against "all actions claims, demands, proceedings and judgments ... which relate to or arise directly or indirectly from Morgan Stanley's engagement under the Agreement." (ADA § 9.)

For all these reasons, I conclude that, despite its disclaimers, there is a genuine issue of material fact concerning whether ADA likely created an agent-principal arrangement—an inherently fiduciary arrangement—between Morgan Stanley and BNP. Were it not for the fact of the disclaimer (which is "some evidence" in the opposite direction), I would conclude that the arrangement was fiduciary as a matter of law.

Moreover, while a principal and agent are free to define the duties between them, it cannot be gainsaid that, in accordance with the explicit terms of this particular arrangement, Morgan Stanley owed BNP a fiduciary duty to do nothing that would adversely affect the price of the Magna stock that it had been retained to dispose of at the best possible price.

How does this give rise to a duty of confidentiality falling within the realm of 10b duties? There are two possible ways:

First, MacLaverty's expert testimony, if believed, establishes that a trader in Morgan Stanley's position was required to keep confidential information that would have a negative impact on the price of the stock it was retained to sell. None of Morgan Stanley's arguments about the weaknesses of MacLaverty's testimony concerning industry confidentiality policies and practices touches on his competence to opine on this point; virtually any trader with two decades of industry experience at five of the largest firms in the business would be equipped to offer such testimony, and this Court will not preclude it.

■ Second, it is a well settled principle of law that an agent is bound by the duties of its principal. Restatement (Third) Of Agency § 3.15 (2006). BNP owed Veleron a duty of confidentiality; that duty was equally binding on its agent. The fact that BNP failed to get Morgan Stanley to sign a confidentiality agreement—a woeful omission on its part—is of no moment, because this particular undertaking was imposed on Morgan Stanley as a matter of law, not contract.

Furthermore, the fact that Morgan Stanley was not subject to any confidentiality under the Swap is completely irrelevant: Morgan Stanley was wearing two hats in this enterprise, as a hedging bank under the Swap and as BNP's Disposal Agent, each of which carried with it its own set of rights and responsibilities. Morgan Stanley might well have been permitted to create a hedge to mitigate anticipated losses on the swap were it only a hedging bank; but its rights as a hedging bank were necessarily limited by any duties it had undertaken, by contract or by operation of law, as BNP's Disposal Agent. *Id.*

So, whether conceived as a duty running directly from Morgan Stanley to Veleron or a duty that ran to Veleron through Morgan Stanley's duties to BNP, there is a

genuine issue of fact as to whether Morgan Stanley had a 10b duty that is enforceable under the *Lyon/Talbot* insider trading analysis. For this reason as well, Morgan Stanley's motion for summary judgment on the ground of lack of duty is denied.

### 3. Veleron Cannot Pursue a Tipper/Tippee Theory of Insider Trading Liability.

Because Veleron has succeeded in raising a genuine issue of fact on a misappropriation theory of insider trading (on both its "basic" and *Lyon/Talbot* theories of misappropriation), it survives Morgan Stanley's motion for summary judgment. There exists a third theory of insider trading liability: tipper-tippee liability. This theory does not fit with the facts of this case.

"Insider trading [liability] ... is not confined to insiders or misappropriators who trade for their own accounts." *United States v. Newman*, 773 F.3d 438, 446 (2d Cir.2014). Under the "tipper-tippee" theory,

> Courts have expanded insider trading liability to reach situations where the insider or misappropriator in possession of material nonpublic information (the "tipper") does not himself trade but discloses the information to an outsider (a "tippee") who then trades on the basis of the information before it is publicly disclosed The elements of tipping liability are the same, regardless of whether the tipper's duty arises under the "classical" or the "misappropriation" theory.

*Id.* (citing *Dirks v. S.E.C.*, 463 U.S. 646, 659, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *Obus*, 693 F.3d at 285–86). To prevail on a tipper-tippee theory as against the tippee, the plaintiff must prove that

> (1) the corporate insider [or misappropriator] was entrusted with a fiduciary duty; (2) the corporate insider [or mi-

sappropriator] breached his fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit.

*Id.* at 450 (internal citations omitted).

A "tippee," may be liable for "insider trading" even though he owes no duty directly to any insider "source." The tippee's liability is derived from his knowledge that his source, the "tipper," breached a 10b duty in providing him with the confidential information in the first place. That is, the tippee's 10b duty is not owed directly to the wronged party (as is the case under *O'Hagan* and a misappropriation theory), but derives from his source's 10b duty to the wronged party:

> tippee responsibility must be related back to insider responsibility by a necessary finding that the tippee knew the information was given to him in breach of a duty by a person having a special relationship to the issuer not to disclose the information ... Tipping thus properly is viewed only as a means of indirectly violating the ... disclose-or-abstain rule.

*Dirks*, 463 U.S. at 660–61, 103 S.Ct. 3255 (internal citations omitted).

In announcing that theory, the Supreme Court referenced ancient notions of the redressability of harms:

> " '[w]here a fiduciary in violation of his duty to the beneficiary communicates confidential information to a third person, the third person, if he had notice of the violation of duty, holds upon a constructive trust for the beneficiary any profit which he makes through the use

of such information.' " 3 L. Loss, Securities Regulation 1451 (2d ed.1961) (quoting Restatement of Restitution § 201(2) (1937)).

*Dirks,* 463 U.S. at 661 n. 20, 103 S.Ct. 3255.

 Veleron cites tipper-tippee cases repeatedly in its brief, but it never articulates a factual basis for pursuing tipper-tippee liability—and understandably so. Under the scenario here at issue, BNP would have to be the tipper. But while BNP had a contractual obligation to keep information about the Veleron loan confidential under most circumstances, it was expressly authorized to disclose that information when necessary to the performance of its obligations under the Credit Agreement. As discussed above, since Morgan Stanley was BNP's Disposal Agent for the purpose of realizing on the collateral that secured the loan, BNP had a contractual right to give Morgan Stanley information about Veleron's default, the possibility that it might be cured, and the possibility that Morgan Stanley might have to undertake to sell the Magna stock on very short notice. BNP also had contractual obligations under the Swap to inform the Participants (including Morgan Stanley) about any margin calls.

Therefore, Morgan Stanley could not possibly have been "on notice" that BNP was disclosing the information relating to the Veleron default *in breach of some duty to keep it confidential*—because, in the circumstances (i.e., once Veleron was in default on the margin call), BNP was under no such duty where Morgan Stanley was concerned. The Credit and Credit Default Swap Agreements make that clear; no reasonable trier of fact could conclude otherwise.

Of course, under the Credit Agreement BNP was supposed to obtain a written commitment that Morgan Stanley would also keep the information confidential, which it failed to do. But that omission, inexcusable though it be, did not convert BNP's otherwise authorized disclosure to its Disposal Agent into an unauthorized disclosure. The *sine qua non* of tipper-tippee liability it the tippee's knowledge that the tipper is violating a duty *by disclosing information.* If BNP breached its duty to Veleron, it was not by disclosing the information to Morgan Stanley (which information was needed in order to plan for the prompt sale of the collateral), but rather in its failure to secure Morgan Stanley's written undertaking to keep the disclosed information confidential.

Furthermore, as discussed above, if Morgan Stanley was BNP's agent under the ADA, then it did not need to sign an NDA to be bound by a duty of confidentiality; that duty was imposed upon it by the law of agency.

It bears repeating that Veleron never actually makes an argument that BNP violated any fiduciary duty it owed Plaintiff by "tipping" Morgan Stanley to the imminent default and surrounding negotiations—all it does it cite tipper-tippee cases, including the Second Circuit's opinion in *S.E.C. v. Obus,* 693 F.3d 276 (2d Cir.2012). Because Veleron repeatedly cites tipper-tippee cases, the Court has taken pains to try to concoct a tipper-tippee theory of liability. None fits the facts of this case, and so none may be pursued at trial.

**C. Veleron Has Raised A Genuine Issue of Fact Concerning Whether It Was Harmed by Morgan Stanley's Trading in Magna Stock.**

Finally, Morgan Stanley argues that Veleron has not raised any genuine issue of fact concerning harm caused to it by

Morgan Stanley's trading. That argument fails for two reasons.

First, Morgan Stanley's argument depends for its force on the loan's being a non-recourse loan. For the reasons discussed above at pages 23 through 29, that is incorrect.

Second, Morgan Stanley says Veleron "conceded" that its expert, Dr. Sanjay Unni, has only provided evidence of loss causation with respect to Veleron's market manipulation claim, and not with respect to Veleron's insider trading claim. That, however, is not the case: Dr. Unni opines that Morgan Stanley's short sales depressed the price of Magna stock, which gave Veleron greater exposure on the loan, ultimately increasing the deficiency. (See Unni Decl. at 15–29.) Morgan Stanley excoriates Dr. Unni's methods, and the Court will reach those objections if Morgan Stanley renews its *Daubert* motion before trial, but they do not mandate summary judgment in Morgan Stanley's favor at this stage.

Morgan Stanley's motion for summary judgment on Veleron's insider trading claim is DENIED.

## IV. Morgan Stanley's Motion for Summary Judgment Dismissing Veleron's Market Manipulation Claim Is Granted

■■■ Veleron also claims that Morgan Stanley—by short selling Magna Stock while in possession of material nonpublic information—violated Section 10(b)'s prohibition against "market manipulation."

Valid securities-manipulation claims under Section 10(b) must allege: '(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or

any facility of a national securities exchange.' These elements—save for the requirement of manipulative acts and a misplaced belief in the price of the security as being set by arms-length, *bona fide* trading—are, of course, identical to Section 10(b) claims generally.

*Fezzani v. Bear, Stearns & Co. Inc.,* 716 F.3d 18, 22–23 (2d Cir.2013) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007); citing *Stoneridge Inv. Partners, L.L.C. v. Scientific–Atlanta,* 552 U.S. 148, 156–57, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)).

■■■ "Manipulation is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (internal quotation marks and citations omitted). "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse,* 190 F.3d 37, 45 (2d Cir.1999); *see also Finn v. Barney,* 471 Fed.Appx. 30, 33 (2d Cir.2012) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ("In the context of the securities laws, the term 'manipulation' refers to 'intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'")).

■■■ Thus, Section 10(b) forbids rigging the price of a security by willfully creating a false impression of supply or demand, imbuing the reasonable investor with "a misplaced belief in the price of the

security as being set by arms-length, *bona fide* trading." *Fezzani*, 716 F.3d at 22–23. A claim of market manipulation "require[s] a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security . . . ." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir.2011) (internal quotation marks and citations omitted). "So long as the investor's motive in buying or selling a security is not to create an artificial demand for, or supply of, the security, illegal market manipulation is not established." *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 383 (2d Cir.1973).

At the motion to dismiss stage, Veleron contended that Morgan Stanley had engaged in just such

> manipulative, price rigging acts throughout the ABB. Specifically, Morgan Stanley (i) allowed BNP to change the terms of its acquisition after submission but before execution, (ii) enabled BNP to obtain the lowest price out of any ABB participant, and (iii) worked with the Participant Banks to allocate their profits and risks by analyzing the breakeven points for BNP and each of the Participant Banks.

(Docket # 161 at 37.) (emphasis added). "Taken together," Veleron previously argued, "these acts demonstrate that Morgan Stanley was engaged in a concerted effort to depress the price of Magna stock prior to the ABB, in order to profit therefrom." *Id.* While skeptical, the court declined to dismiss the complaint at that point.

Veleron has now dropped that theory completely.

Veleron's current and entirely new theory is that Morgan Stanley "committed manipulative acts by short selling [prior to the ABB] while in possession of confidential, non-public information."

Veleron's post-discovery "manipulation" theory is, however, not market manipulation. It is insider trading without the imposition of any duty. That is not a tenable theory.

Again, "Manipulation is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc.*, 430 U.S. at 476, 97 S.Ct. 1292 (internal quotation marks and citations omitted).

■ The Second Circuit has explained that

> A market manipulation claim . . . cannot be based solely upon misrepresentations or omissions. There must be some [manipulative] market activity, such as wash sales, matched orders, or rigged prices. Furthermore, short selling—even in high volumes—is not, by itself, manipulative. Aside from providing market liquidity, short selling enhances pricing efficiency by helping to move the prices of overvalued securities toward their intrinsic values.

*ATSI*, 493 F.3d at 100–01 (internal citations and quotation marks omitted). Thus, an omission on its own means nothing without a manipulative act, and short selling on its own is not a manipulative act. *Id.* Where the short selling itself is not manipulative in nature, its combination with an omission will not result in a "manipulative act." *Id.*

■ For short selling to qualify as "manipulative," short selling must be used in a manipulative way, i.e. through a method that sends a false signal about supply or demand, masking the true nature of the

forces setting a security's price. *Id.* For example, in *ATSI*, the defendants allegedly manipulated the market in ATSI's common stock by bringing about a "death spiral" in the price of ATSI's common stock. The scheme, as alleged, worked as follows. The shareholder would short sell the victim's common stock to drive down its price. He then converts his convertible securities into common stock and uses that common stock to cover his short position. The convertible securities allow a manipulator to increase his profits by allowing him to cover with discounted common shares not obtained on the open market, to rely on the convertible securities as a hedge against the risk of loss, and to dilute existing common shares, resulting in a further decline in stock price.

*Id.* at 95.

It is only short selling "willfully combined with something more to create a false impression of how market participants value a security" that may constitute a manipulative act. *Id.* at 101; *see also In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513, 534 (S.D.N.Y. 2008).

Veleron offers no evidence of "something more" that is manipulative in nature: no wash sale, no matched order, and no price rigging. Instead, it argues that the "something more" in this case is Morgan Stanley's possession of material, nonpublic information at the time of its short selling.

 Short selling while in possession of inside information, without more, is at best insider trading. Veleron is quite obviously attempting to have its cake and eat it too—to pursue a duty-free insider trading claim, in case it is not successful is persuading the trier of fact that Morgan Stanley owed Veleron any duty, whether directly or indirectly. The effort to prevail on a watered-down insider trading claim is

transparent and this Court will not be party to it.

Furthermore, on the facts of this case, Veleron's argument is self-defeating. Veleron argues that one engages in a manipulative act simply by establishing short positions while in possession of confidential information that tends to show that the price of the security will go down. But if short selling sends any signal to the market at all, it signals the seller's belief (whether predicated on inside information or on careful analysis of market conditions) that the stock is overvalued and likely to go down. For that reason, in *ATSI Communications, Inc. v. Shaar Fund, Limited*, 493 F.3d 87 (2d Cir.2007), the Second Circuit found that short selling is not inherently manipulative; rather, it is valuable to the market insofar as it helps to drive down the prices of overvalued securities. 493 F.3d at 100–01. Veleron's expert contends that that was precisely the message that Morgan Stanley's short selling sent—that the stock was more expensive than economic realities justified—and he argues that the market took the hint and valued Magna shares at a lower price as a result.

Market manipulation "mislead[s] investors into believing that the market has discovered some ... news and ... [causes] the duped investors then [to] transact accordingly." *ATSI*, 493 F.3d at 100–01 (citing *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566, 579 (S.D.N.Y.2005), *aff'd Tenney v. Credit Suisse First Boston Corp.*, No. 05–3450–cv, 2006 WL 1423785 (2d Cir. May 19, 2006)). That is not what occurred here. Rather than "deceiv[ing] investors by [falsely] suggesting that the market has discovered new information that is affecting the price of ... securities," *In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d at 534, if

Morgan Stanley's short sales told the market anything, they told it the truth—albeit a truth Veleron would rather have kept quiet.

Morgan Stanley's motion for summary judgment denying Veleron's market manipulation claim is, therefore, GRANTED.[18]

## CONCLUSION

For the foregoing reasons, Morgan Stanley's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Morgan Stanley's motion to exclude the testimony of Mr. Robert M. MacLaverty insofar as that testimony is discussed in this opinion. is DENIED; Morgan Stanley is free to argue via a motion *in limine* that other portions of MacLaverty's testimony should not be admitted (and at present the court is inclined to look with favor on such a motion). Morgan Stanley's motion to exclude the testimony of Dr. Sanjay Unni is DENIED; without prejudice to an *in limine* motion. The Clerk of the Court is directed to remove Docket Nos. 241, 245, and 249 from the Court's list of pending motions.

---

18. Because there are more obvious bases for dismissing this claim, there is no need to address Morgan Stanley's argument that Veleron does not rely on an assumption of an efficient market, free of manipulation, in support of its market manipulation claim, and I do not do so.